## Moor *et al.* v. Parks *et al.*

[84 South. 230. No. 20686.]

1. .WILLS. *Proof of due execution and capacity makes prima facie case of validity.*

   In a contest as to the validity of a will, proponents make out a *prima facie* case by proving the due execution of the will and the testamentary capacity of the testator. From the proof of the testamentary capacity the presumption arises that the will was freely and voluntarily executed.

2. WILLS. *Testator's declaration as to intentions admissible as to capacity and undue influence.*

   The declarations of a testator as to his testamentary intentions and as to the contents of a will are admissible on the issues of testamentary capacity and undue influence, whether made before, at the time, or after the execution of a will.

3. WILLS. *Declarations of testator not evidence of truth or falsity thereof.*

   The declarations of a testator as to the contents of a will are not evidence of the truth or falsity of the declarations.

4. WILLS. *Elements of testamentary capacity stated.*

   If at the time of the execution of a will testator appreciated the nature of his act, the natural objects of his bounty, and was capable of reasoning and thinking how he desired to devise and bequeath his property, he possessed sufficient testamentary capacity.

5. WILLS. *Motive of testator immaterial.*

One of testamentary capacity may execute a will from any motive, whether it be love, gratitude, partiality, prejudice, whim, or caprice.

6. WILLS. *Occasional fits 'of anger not connected with will does not show incapacity.*

Testamentary capacity having been shown, evidence of fits of anger which sometimes .dethroned the reason of testator is not sufficient testimony of lack of testamentary capacity at the time of execution of the will, in the absence of proof showing the will was executed during such a spell.

7. WILLS. *Subsequent inconsistent will revokes former will.*

A will is revoked by a subsequent will containing inconsistent devises and bequests of all the property disposed of in the prior will.

8. WILLS. *Lost will cannot be proved by testator's hearsay statements.*

The contents of a lost will, its execution having been shown, cannot be proved by the hearsay statements of the testator.

APPEAL from Chancery Court of Tate County.

HON. JAS G. MCGOWEN, Chancellor.

Proceeding by R. R. Moore and others to probate in solemn form the last will of Jane T. Prichard, deceased, opposed by Cordelia E. Parks and others. Proponents' motion for a peremptory instruction was denied, and they appeal. Reversed and remanded.

*John Waddell* and *C. L. Sivley,* for appellants.

We say that the motion to exclude all of this testimony and to direct a verdict in favor of the proponents of the will, should have been sustained, and the request for a peremptory instruction at the close of the testimony to direct the jury to return a verdict in favor of the proponents of the will should have been given, and it was clear error on the part of the court below under all the evidence in the case not to have sustained said motion and refusing to give said instruction.

"Mere sporadic exhibitions of temper and occasional demonstrations of anger are not evidence of any unbalanced or unsound mind. Mere physical weakness or disease, old age, eccentricities, blunted perception, weakened judgment failing memory or mind are not necessarily inconsistent with testamentary capacity." Richmond's Appeal, 21 Am. St. Rep., quotation from page 92.

"Weakness of memory, vacillation of purpose, credulity and vagueness of thought may all exist with adequate testamentary capacity under favorable circumstances." *Hall* v. *Perry,* 47 Am. St. Rep. 352 and 353; *In re Gross,* 14 N. Y. St., page 429, affirming 7 N. Y. St. Sup., page 739; *In re White's Will,* 52 Hun. 613, 5 N. Y. Sup. 295; Judgment affirmed, 121 N. Y. 406, 24 N. E. 935.

The above principle was confirmed at an early date by the supreme court of Mississippi in the case of *Brock* v. *Luckett,* 4 Howard, 482; *Sheehan* v. *Kearney,* 82 Miss. 688.

In proceedings to probate and establish a lost will or a will wrongfully destroyed, the policy of the law requires the contents to be established by the clearest, most conclusive and satisfactory proof and this must apply to the whole contents of the will and not merely to parts of same. The entire contents of same must be shown and established conclusively. *Vining* v. *Hall,* 40 Miss. 83.

But it is not claimed in the case at bar to establish this third will which was lost or destroyed because it was never seen by anyone at the time of the death of the testatrix, or since her death, and no one knows its contents, but it is merely contended by the contestants in this case that having proof that this subsequent will was executed, the effect thereof was to revoke the will propounded for probate, being a previous will. It has been held by a very high authority that the loss or

destruction of a subsequent will which was shown to contain an express revoking clause of all former wills destroyed the act of revocation as well as the will, and revived the former 'will. We call the attention of the court to this authority as it is very interesting and full upon the proposition. *Stetson* v. *Stetson,* 61 L. R. A. 261.

In Mississippi the opposite rule has been announced from that announced in the Stetson case, and where a subsequent will is shown to have been executed and is clearly shown to have contained a revoking clause of all former wills, it will have that effect, although it be wholly inoperative as to the disposition of the estate attempted to be made. *Harrison* v. *Harrison,* 30 Miss. 276.

Under the statutes of Mississippi providing how a will may be revoked by acts of destruction, cancellation or obliteration unequivocal in their nature, or by the execution of a declaration in writing attested by witnesses, it is held revocation of a former will may also be made by implication, to wit in the execution of a subsequent will not containing any revoking clause but making an entirely inconsistent disposition of the testator's property with the disposition thereof contained in the former will. *Harrison* v. *Harrison, supra; Hoy* v. *Hoy,* 93 Miss. 732.

Therefore, it is required that the act of revocation either express or implied, in order to be effective must be established by the same degree of clearness and conclusiveness of proof as is necessary in the establishment of a lost or inadvertently destroyed will.

"This court has, heretofore, said, in speaking of the revocation of wills, that no declaration designed for the purpose of revocation can be efficacious for that purpose unless executed with all the formalities required in the execution of a will." *Harriston* v. *Harriston, supra.*

Where a witness was introduced to prove express declarations made by the 'testator in his lifetime, before and after making his will, that he had not made, and would not make, and never intended to make, a will this testimony was excluded by the lower court as incompetent; and this action of the court was affirmed by this court, following *Sheehan* v. *Kearney, supra,* holding that the declarations of a testator as to his intentions with respect to the disposition of his property, made before or after the execution of the will, or at the time of the execution of same, are competent on the issue of undue influence and the issue of insanity, yet that the same is not competent on any other issue, and affirmed the action of the lower court in excluding the same. *Miller* v. *Miller,* 96 Miss. 526; 35 Wigmore on Evidence, 1736-39, sec. 2244. This testimony was utterly incompetent on the trust theory, for another reason, viz: because a mere parol promise to make a will devising property in a certain manner would be void under the statute of frauds. *Pond* v. *Sheehan, Ex.,* 8 L. R. A. (O. S.) 414; *Orth* v. *Orth,* 32 L. R. A. (O. S.) 298.

An instruction upon an abstract principle of law and upon a proposition upon which there is no evidence introduced or no evidence on which to found the same is erroneous and only tends to confuse the jury. *Newton* v. *Simmons,* 69 Miss. 17.

To the same effect are the cases, of *Easley* v. *R. R. Co.,* 96 Miss. 396; *Honeycutt* v. *R. R. Co.,* 50 So. 697; *R. R. Co.* v. *Williams,* 96 Miss. 373. In other words, if the testimony of Mrs. Elder and all the others who testified as to the casual statements made by Mrs. Pritchard in her lifetime as to what she intended to do with her property by will, is given its full significance in this case, the same does not rise to any dignity of probative force in view of all the testimony or all the

witnesses in the case as to her strong mentality at the time the will was written and up to the time of her death, and in this view of that evidence, the repeated charges asked by the contestants and given by the court, unduly emphasized the same and were erroneous and, no doubt, confused the jury, and should not have been given.

Sixth proposition. This instruction was clearly erroneous in this, that while it correctly stated that a will shown to have been executed by a person, but which is not found at the time of death, is presumed to have been destroyed by the maker, the instruction then proceeds to state that if the jury believed from the evidence in the case that after the date of the will, propounded for probate, Mrs. Prichard duly executed another will disposing of all her property in a different way from that provided in the will propounded and that said will was in existence at the time of her death, or that she believed it to be in existence at her death, then the will propounded for probate was not her last will and the jury should find for the contestants.

This instruction was clearly erroneous on the following grounds: 1. There was absolutely no evidence in the case given by any witness that the subequent will which was said to have been executed by Mr. Prichard in December, 1906, or January, 1907, and witnessed by Daily and Gilliland at the postoffice, contained any revoking clause or made any disposition of Mrs. Prichard's property whatsoever, either in a different way from the disposition of same in the will propounded for probate, or otherwise, and there was absolutely no evidence from any witness, or fact or circumstance in the case that this subsequent will was in existence at the time of the death of Mrs. Prichard, and absolutely no evidence of any kind or character that she thought or believed it was in existence at the time of her death.

In other words, this instruction assumed a state of facts that was not shown by any testimony in the record, and was not justified by any view of any testimony given by any witness in the case. Mrs. Prichard may have executed a subsequent will and this subsequent will may have expressly ratified the former will made by her on Christmas day of 1903. It may have been simply a reiteration of that will in a more orderly and clearly expressed manner; it may have been simply a codicil to said will. No one knows what was in this subsequent will and no one pretends to say what was in it. No person is produced who read this subsequent will or can tell what its contends were, and we respectfully submit that the giving of instructions in a case to a jury that are not warranted or justified by any fact in the case, or by any inference drawn from any fact in the case, is not only misleading and harmful, but it is clear error and prejudicial to give the same. See authorities, *supra*.

We respectfully submit to the court that there was no justifiable evidence in this entire case to overthrow the solemn will made by Mrs. Prichard, and which was offered for probate; that it will not do to leave to juries the unlimited power and discretion of overturning a solemn instrument as a will. It is common talk among the laity that any will can be set aside by the courts and it seems to be that a great many persons are fearful of making wills because of the frequency with which they are overturned and set aside by juries.

We, therefore, further respectfully submit to the court that there was no reason given in this case or testimony that in any way justified the verdict of the jury, and that the verdict should have been set aside by the court below and a new trial granted. This was not done, and we further respectfully submit that it was error on the part of the court below not to have excluded all evidence offered by the contestants of the will and directed a verdict in favor of the proponents, as was

asked to be done, and it was further clear error in refusing to give the instructions as asked by the proponents of the will directing a verdict in favor of the proponents of the will, and for these and the other reasons assigned, we now ask that the verdict and judgment in the court below be set aside and a new trial granted.

*F. C. Holmes, J. F. Dean* and *Holmes & Sledge,* for appellee.

Where the issue of undue influence is tendered and joined, then the proponent assumes the burden of proving the absence of undue influence. The record of a probated will in common form, would satisfy this burden. In the absence of such probate, the question of undue influence is not one of legal presumption, and is the very issue that is being tried.

The answers of Cordelia E. Parks and Enoch Parks expressly charged that said will was not the free and voluntary act of Jane T. Prichard, but was the product and result of the undue influence of R. R. Moore, the brother of the testatrix over her. There should have been some evidence, however slight offered by the proponents, to disprove this undue influence and in the absence thereof the court should have sustained the motion of the contestants, which would have resulted in the same verdict and judgment as was rendered. See *Sheehan* v. *Kearney,* 82 Miss. 688.

Quoting from the opinion in the above case: "The issue is single—will or no will, and when we consider that the exercise of undue influence implies some degree of mental capacity to be overcome, and how indissolubly the two things are implicated, the one in the other, it seems to us clear that the burden as to both is on the proponent throughout, and there is no shifting of this burden, but the burden in both respects is satisfied by the introduction of the will and the record of the probated will, and the contestants must then offer proof to

overcome the *prima-facie* case thus made in both re-
spects, "which shows in the above case the will had
been probated and there was a judgment of the court as
to the capacity of the testator, and the exercise thereof
and that therefore free agency and the absence of undue
influence would be presumed. We respectfully cite:
*King* v. *Rowan*, 82 Miss. 1; *Sheehan* v. *Kearney* 82
Miss. 688; *Jamison* v. *Jamison*, 96 Miss. 288.

The contestants contend that in the light of the facts
disclosed by this record, the provisions made in
said will for Enoch Parks, are entirely inconsistent with
the duties of the testatrix with reference to her property
and her family. If this is true, it of itself imposes upon
the proponents the necessity of giving some reasonable
explanation of the unnatural character of the will.

We do not question the soundness of the authority
quoted by opposing counsel, namely: Richmond's Ap-
peal, 21 American State Reports, *Paul* v. *Perry*, 47
American State Reports, and other authorities cited in
that connection as to the many and varied characters
of mental infirmities and imperfections that may exist,
and yet not be inconsistent with testamentary capacity.
But any one of said conditions may be a circumstance
along with other facts that can be considered as evi-
dence of testamentary incapacity.

Upon the question of revocation by subsequent will we
respectfully and most earnestly contend for, the follow-
ing principles are recognized and established law in
Mississippi: "First: That the revocation of a will may
be expressed or implied. That it is recognized that rev-
ocation by implication is good and effective in Missis-
sippi, which fact is not contested by counsel for appel-
lants. It is expressly adjudicated that a subsequent
will duly executed will operate to revoke a former will,
upon either of two states of facts, even though such
subsequent will may be lost or destroyed, and is never
effectively probated as a will.

First, If such subsequent will contains a revoking clause, it will operate to revoke the former will even though all other portions of the will may be inoperative. Second, If the subsequent will duly executed contains a disposition of the property wholly inconsistent with the disposition made in the former will. *Hoy* v. *Hoy*, 93 Miss. 732; *Garrott* v. *Dabney*, 27 Miss. 335; *Hairston* v. *Hairston*, 30 Miss. 276. See notes in *Stetson* v. *Stetson*, 61 L. R. A. 261; *Vinning* v. *Hall*, 40 Miss. 83; *Bohannon* v. *Walcot*, 1 How. 336; 14 Enc. of Ev., page 469; 1 Alx. on Wills, 752.

Applying the rule as announced to the facts in this case: the proof abundantly shows and counsel for appellants freely admit that a subsequent will was duly executed on or about December, 1906, to which W. R. Gilliland and M. H. Daily were subscribing witnesses, and that this will was executed with all of the niceties and requirements of the law. *Sugden* v. *Lord St. Leonard*, 45 L. J. P. 49; *Dane* v. *Hill*, 68 N. Y. 275; *McDonald* v. *McDonald*, 142 Ind. 55. Special attention is called to the case of *Behrens* v. *Behrens*, 47 Ohio State, 323, also reported in Vol. 21, page 820, Am. State Rep.

Learned counsel for appellants practically admits that if this subsequent will of 1906 had contained a revoking clause, that it would have revoked the former will, even though it is now lost or destroyed. The same result is necessarily reached where the subsequent will contains inconsistent disposition of the testatrix's property. Learned counsel would doubtless admit that if either of the subscribing witnesses to said subsequent will could have stated the contents thereof, showing such a disposition of the testatrix's property, inconsistent with the disposition made by the will now being tried, that it would have worked a revocation. Therefore, the only further question is as to the admissibility of the evidence of these witnesses detailing the direct statements of the testatrix as to the contents of her said subsequent

will. The above authorities, in our opinion, fully answer this question in favor of the contestants. If this is true, then it was manifestly proper for the jury to consider the question of revocation, and it was not error for the court to have granted the instruction predicated thereon.

In answer to the third and fourth propositions of counsel for appellants, we insist under the authority hereinbefore cited that it was competent for Mrs. Elder to testify as to statements made by the testatrix with reference to the disposition of her property either before or after the date of said will, for the purpose of deciding the capacity of the testatrix at the time she made the will. Such evidence, for the purpose offered, was not hearsay, but direct, and the best obtainable. The issue being tried by the jury was testamentary capacity at the time of the will.

Learned counsel has misconceived our contention as to the trust theory. The trust issue has not yet been tried. The trust contended for may result by construction, regardless of which of the many wills of the testatrix may be established. The trust question has not yet been put in issue. The will of December 25, 1903, is now in issue. Upon the question as to the capacity of the testatrix, her conversation and statement with regard to the recognition of a trust imposed upon her by her deceased husband, is most material evidence. Such a trust, whether it amounts to a legal obligation or not, if consistently or persistently recognized by the testatrix as a binding moral obligation, at any and practically all periods of her life after her husband's death, except upon the unhappy Christmas Day of December 25, 1903, we say that the failure to recognize that moral obligation at that particular time is within itself an exceedingly strong circumstance tending to show mental aberration. Sanity not unlike truth is consistent, while insanity is generally inconsistent,—and is evidenced by inconsistency.

Further, in connection with this trust feature, the rights of appellees predicated thereon are recognized in the case of *Benbrook* v. *Yancey,* 96 Miss. Learned opposing counsel appears to have fallen into error along practically all lines of argument, by needlessly confusing the issue. They seem to lose sight of the fact that the question of testamentary capacity, as to this particular will, was the principal issue involved. And they lay stress upon the fact that appellees have failed to prove the existence of a constructed trust, when, at this stage of the litigation, it is not encumbent upon appellees to make proof of either. The statement made by counsel for appellants as to common talk among the laity to the effect that any will can be set aside by the courts and that a great many persons are fearful of making wills because of the frequency with which they are overthrown and set aside by juries, is not appropriate upon the facts of this record. It could more consistently be urged by the contestants that the laity will be confused, confounded and loose confidence in the righteousness of the judgment of the courts, when proponents are allowed to seize upon an instrument of the kind offered for probate as shown by this record and have it judicially declared to be the last solemn will of the testatrix when this record conclusively shows to any mind, whether lay or judicial, that as a matter of fact, it is most improbable that Mrs. Jane T. Prichard died in the year 1916 intending that this ridiculously unreasonable writing of hers made thirteen years previous should be established as her last will. We therefore in conclusion invoke and commend the wisdom which resulted in the establishment of Rule No. 11 of this court.

It certainly does not affirmatively appear from this record that the judgment appealed from has resulted in a miscarriage of justice. It were better that the testatrix should be adjudged intestate, and the law allowed to make a will for her, than that a will of December 25,

1903, should be established as her last will and testament.

Sykes, J., delivered the opinion of the court.

The petitioners, appellants, in the chancery court offered for probate in solemn form an alleged holographic will of Mrs. Jane T. Prichard dated December 25, 1903. All of the heirs, legatees, and devisees of the testatrix were made parties to the proceedings and duly appeared and filed answers and, in some instances, cross-bills. An issue of *devisavit vel non* was made.

The precise issues joined were: "(1) Said instrument was not signed, published, and declared by the testatrix as her last will and testament and was not made with testamentary intent. (2) Upon the date of the execution of said instrument the said testatrix was not of sound and disposing mind and memory. (3) Said instrument was not executed by the testatrix freely and voluntarily and without undue influence. (4) Said alleged will was revoked by the testatrix by a subsequent will or declaration in writing duly executed."

The testatrix, Mrs. Jane T. Prichard, was the widow of E. S. Prichard and was devised by him, in fee simple, the property owned by her at her death. E. S. Prichard was twice married; his wives were sisters. By his first wife he had a child who had two children, Enoch and Cordelia Edenton Parks. The mother of the Parks children died when these children were quite young, and they were brought to their grandfather's home and reared by him and his second wife, the testatrix in this case.

Several years before the death of Mrs. Prichard, Enoch Parks was married and moved to a home of his own two or three miles from the home of the testatrix. Cordelia Edenton Parks, who is a cripple, being a paralytic, continued to live with her step-grandmother and

great-aunt until the time of her death. After the death of her husband, E. S. Prichard, R. R. Moore, a brother of testatrix, moved to Tate county and assisted the testatrix in looking after her property.

Under the alleged will in issue the testatrix left the great bulk of her property to her brother, R. R. Moore, and to Cordelia Edenton Parks. R. R. Moore is named as executor, improperly designated in the will administrator. Enoch Parks was left only fifty dollars. The will is as follows:

"This the 25th day of December, 1903, I now write my last will and testament, I, Jane T. Prichard, being of sound mind and memory, I give my soul and body to my Heavenly Father, the giver of all good gifts.

"Item 1st. I bequeath to Cordelia Edenton Parks my home place and all my household effects and my tools, buggy and what stock, that is horses, mules, cows and hogs, that I may own on the place at my death.

"2d. I bequeath to Cordelia Edenton Parks two-fifths of what money I may leave after paying all my debts and burial expenses. Also I give her my brick storehouse in the town of Coldwater. Also the southeast quarter section twenty-two, township four, range ten in Tunica county, Mississippi. I give her this property to have during her lifetime, and should she marry and have children it goes to them, except I give one-third of her property as a life estate to her husband, and at his death it is to go to her children. Should she leave no children all her property goes to Lou Burford except the one-third part of her husband and at his death it goes to Lou Burford. Cordelia Edenton Parks' property cannot be taken to pay off any debts made by her husband, and neither is she to give Enoch Parks any of her property. If she does she loses the whole estate given.

"Item 3d. I bequeath to Enoch Parks fifty dollars and no more of my property.

"Item 4th. I bequeath to my brother, R. R. Moore, the place he resides on, Frank Blackburn place, Mc-Crocky place, section twenty-seven, township four, range ten, five hundred and thirty acres. Also the southeast quarter section thirty-four, township four, range ten, one hundred and fifty-four, should I own the above property at my death.

"Item 5th. I bequeath to my brother, R. R. Moore, one-fifth of what money I have after all expenses have been paid and I also give him all tools and horses and mules on hand of mine that he may be using.

"Item 6th. I bequeath to Lou Burford one-fifth of my money after all my debts are paid at my death.

"Item 7th. The remainder of my property I give to the man I marry. Should I never marry then it is to be equally divided between Cordelia Edenton Parks, R. R. Moore Sr., Lou Burford, and to the heirs of my sister's children who may be living.

"Town of Prichard as lots are sold off divide proceeds between R. R. Moore, Cordelia Edenton Parks and Lou Burford. I appoint R. R. Moore as administrator of my estate without any bond. Turn each one's part of estate over to them as soon as I am buried and also debts have been settled. I wish my body to be carried to my grave in my wagon and place my body besides E. S. Prichard in my lot, and on the side of his monument put my name Jennie T. Prichard as he loved to call me by that name, and on the other side put Julia.

"I now subscribe my name,

"Jane T. Prichard.

"I want my will at Chism Bros. & Co. burned up."

The original will was sent up for the inspection of the court and has had our careful examination.

The testatrix died in 1916. Immediately after her death her brother, R. R. Moore, other relatives, and

some disinterested parties, examined the papers found in her wardrobe, desk, and other places in her room, and sent to the bank those papers they thought were valuable. The other papers were put in tow sacks and taken to the house of Mr. Moore, where they were later examined.

Mrs. Prichard was in the habit of preserving letters, papers, receipts, memoranda, etc., of all kinds. These were found in her wardrobe, desk and other parts of the room and house. It is shown that there were from five to ten tow sacks full of these papers taken from her room. Among her effects were found some paper and gold money. The searchers came across a will written in May, 1903, which they considered at that time to be the last will of the testatrix. In this will her brother, R. R. Moore, was also named as executor. Ample provision in it was made for him, Enoch, and Cordelia Edenton Parks. This will was probated in common form by the clerk, but before his action was approved in term time by the chancellor the will now in question was found. The testimony shows that several days after these tow sacks had been taken to the house of Mr. Moore an investigation of their contents was begun by the Moore family, when the will in question was found in sack No. 2, folded and wrapped with some tax receipts. Showing on the outer folds of the will, or on the outside page as it was folded, was a letter addressed to Judge Stephens dated 1898. This letter was written in pencil. The will is wholly written and signed in pencil. From the testimony it is not clear whether this alleged will was taken from the desk, wardrobe, or what part of the room of the testatrix, but it is certain that it was among her effects somewhere in her room after her death.

After the finding of this will Mr. Moore communicated with his attorney and then a short time thereafter the bill in this case was filed. The bill sets forth

fully the facts and circumstances relating to the finding of both of these wills, and among other things offers this second will for probate in solemn form.

The only question presented is whether or not this will of December 25, 1903, is the last valid will of Mrs. Jane T. Prichard. Upon the trial of this issue before the jury the proponents proved that the will was wholly in the handwriting of Mrs. Prichard and signed by her; that both before and after the date of the will she was a woman of strong mentality, capable of managing her own affairs and of understanding her business dealings; that as a matter of fact she personally looked after a great deal of her business; that her brother, R. R. Moore, assisted her in managing her affairs. She possessed quite a large estate of plantations, store-houses, and personal property. In other words, the testimony shows that she possessed sufficient testamentary capacity to make a will. She was about 65 or 67 years old at the time the will was made. The will was then introduced and proponents rested.

Contestants here moved the court to exclude the testimony of proponents and direct a verdict for contestants because one of the issues presented to the jury was undue influence; that the burden of proof rested upon proponents to prove both mental capacity and absence of undue influence; that they had failed to meet this burden by showing that there was no undue influence exercised upon the testatrix when she made the will. In their pleadings the contestants claimed that this will was procured through the undue influence of R. R. Moore, the brother of contestants. This motion of the contestants was overruled by the court.

Contestants rely upon the case of *Sheehan* v. *Kearney.* 82 Miss. 688, 21 So. 41, 35 L. R. A. 102. In their brief they copy the following excerpt from this opinion:

"The issue is single will or no will. And when we consider that the exercise of undue influence implies

some degree of mental capacity to be overcome, and how indissolubly the two things are implicated the one in the other, it seems to us clear that the burden as to both is on the proponent throughout, and there is no shifting of this burden. But the burden in both respects is satisfied by the introduction of the will and the record of the probated will, and the contestants must then offer proof to overcome the *prima-facie* case thus made in both respects." 82 Miss. 700, 21 So. 45, 35 L. R. A. 102.

Reading further from this same opinion, on page 701 of 82 Miss., on page 45 of 21 So. (35 L. R. A. 102), after quoting from and discussing the case of *Baldwin* v. *Parker,* 99 Mass. 79, 96 Am. Dec. 704, we find:

"To put it in exactly equivalent phrase, it might be said, that the alleged testator was not a free agent is not to be presumed. On the contrary, capacity proved, the legal presumption is that he was a free agent— that the alleged will was his free and voluntary act. And this presumption satisfies the burden of proof as to undue influence, and the contestant is thus put to his proof."

The *prima-facie* case of mental capacity and absence of undue influence is made by the probate of the will in common form. The oath required of witnesses in a probate of a will in common form, among other things. requires that affiant must depose that the testator was then of sound and disposing mind and memory. No proof is required as to the absence of undue influence. The capacity being proven, it is necessarily presumed that the will was made in the absence of undue influence, or, as is ably expressed by that gifted jurist, the lamented Judge Whitfield, "capacity proved, the legal presumption is that he was a free agent—that the alleged will was his free and voluntary act."

In order to make out a *prima-facie* case in the probate of a will in solemn form before the chancery court, the same testimony is there required as is required before the chancery clerk to probate in common form, with the exception, of course, that affidavits of subscribing witnesses may be used in the proceedings to probate in common form before the clerk.

In the case of *Jamison* v. *Jamison,* 92 Miss. 468, 46 So. 83, 945, on the trial of the issue *devisavit vel non,* where contestants alleged lack of testamentary capacity and undue influence on the part of his wife in the making of the will on the trial, the proponents proved the execution of the will and the testamentary capacity of the testator. The contestants then offered testimony tending to show that the will was the result of undue influence improperly exercised by the wife. When contestants had rested their case proponents introduced the widow of the testator and undertook to prove by her that there was no undue influence. Contestants objected to her testimony on the ground that it was not in rebuttal and should have been brought out by proponents on the examination in chief. This objection was sustained in the lower court. On appeal to this court the same learned jurist who wrote the opinion in *Sheehan* v. *Kearney* wrote the opinion in this case merely stating that it was fatal error in the court below to have denied the widow the right to testify on the question of undue influence. As we construe this opinion in the light of the opinion in *Sheehan* v. *Kearney,* it merely means that the presumption that the will was freely and voluntarily executed necessarily follows from proof of testamentary capacity. The court was correct in overruling the motion of contestants.

The contestants then introduced several witnesses to show that at the time Mrs. Prichard executed this will she was not possessed of sufficient testamentary capacity to do so, because she was at that time in a violent

fit of anger with Enoch Parks which temporarily dethroned her understanding, reason, and capacity to make a will.

In order to show a revocation of the will in question the testimony of two witnesses, Gilliland and Daily, was introduced to show that either in the latter part of the year 1906, or early in 1907, they were called by Mrs. Prichard in the post office at Coldwater, Miss., and asked by her to witness her will; that she signed the same in their presence, and they signed it as witnesses. Neither of them read the will, nor could testify as to its contents. Mr. Daily testified that he started to read it but was stopped by the testatrix. He only remembers that it began, "I, Jane T. Prichard, make this my last will and testament," but he remembers nothing else in the paper. The contents of this alleged will, over the objection of proponents, was attempted to be proved by statements made by the testatrix to three different ladies. This testimony will be hereafter quoted.

One of the contentions of appellees is that the provisions in the will show that the testatrix was not a person of sound and disposing mind and memory when it was written; that in one of its items she makes provision for the man she might marry, when it is absurd on its face to think of a woman 65 or 67 years old marrying again. We cannot conceive the force of this argument. It might be a little unusual for a man or a woman of this age to marry again, but we all know that many of them do who apparently are possessed of mental capacity. Our attention is also called to the item in the will relating to the prospective marriage of Cordelia Edenton Parks. It is claimed that the record shows that she is a hopeless cripple and paralytic and no sane person would think of her marrying. The record merely shows that this young lady is a cripple and a paralytic. The extent of her affliction is not shown. It is presumed that she is sane, and we see no reason

why a mere physical affliction should prevent one from marrying.

The first witness for the contestants, Mr. Gilliland, after testifying to witnessing the alleged 1906 or 1907 will in the back part of the post office, testified on cross-examination: That he had known Mrs. Prichard since he was a little boy. At the time he testified he was 57 years old. That she seemed to be a' woman of good judgment and transacted her business affairs. That she had considerable property and was capable of attending to her business and he supposed did it well. That he knew her well in 1903 and thought she was then of good, strong character and mind and capable of knowing how to make a will, and that he had no doubt of it. That during that time whenever he saw her she was capable of transacting her business. That she was a good business woman. That her brother, R. R. Moore, assisted her in attending to her business affairs.

Mr. Daily testified: That he had known the testatrix all of his life. That he had had business dealings with her. That in 1906 or 1907 he was postmaster at Coldwater. That she did her postal business with him. That he witnessed a will for her in the post office either in 1906 or 1907. That Gilliland was the other witness. The alleged will was typewritten on white paper with a colored back. That he started to read it, and had read about halfway down the first page when Mrs. Prichard stopped him. That she signed it with pen and ink. That at that time Mrs. Prichard said something of taking care of Mr. Moore, but he cannot remember what, but that among other things she stated that she wanted to entail her property like the old English law, which she said was the best law. He was asked about her general disposition and answered:

"She could not stand opposition; wanted things her own way. Q. Tell whether she was that way continually or just had spells. A. I have seen her when she would

be very pleasant and at other times when she would be very irritable; at times she would let me hunt on her land and at other times she would not let me put my foot on her place."

That her general disposition was rather irritable. That she was very pleasant with people who agreed with her and if they did not agree with her she did not like them much. Asked as to her feeling toward her brother, R. R. Moore, he replied:

"I have never seen a more devoted brother and sister. They almost always agreed; they were very close together. She would usually agree with him in everything he said or did. Q. You spoke about her having spells of high temper; what was her condition of mind and temper when she would have one of these tantrums? A. I really do not know. I never have seen her but one or two times that way; but if she was your friend or foe she would not let you do anything if she did not want to; anything over which she had any control."

On cross-examination this witness testified that he knew Mrs. Prichard in December, 1903, and that he considered her of sound mind and memory at that time and he so considered her until her death.

Q. You regarded her as a strong character and had knowledge enough to handle and dispose of her property? A. Yes, sir; if she wanted to. Q. You stated that she could not brook opposition? A. Yes, sir. Q. She was a dominating factor herself? A. Yes, sir. Q. She would let nobody dispute her? A. It irritated her considerably."

The witness also on cross-examination further testified as follows:

"Q. All that you can recollect about what Mrs. Prichard said about her property was that she wanted to make her will and protect Miss Edenton? A. That among other things. Q. That and about her brother, R. R. Moore? A. Yes, sir."

Mrs. Sallie Hardin testified for the contestants: That prior to moving to Memphis twelve or fourteen years before the trial of this case she lived within half a mile of Mrs. Prichard; knew her well, and frequently saw her and in the summer time often stayed two or three weeks with her. That after she moved to Memphis she did not see her as frequently as before, but would go down two or three times a year, and that continued until Mrs. Prichard's death. That Mrs. Prichard would frequently talk to her about the disposition she intended to make of her property. Over the objection of the proponents the following testimony was permitted to go to the jury:

"Q. When did Mrs. Prichard make the last statement to you with reference to her property? A. About four years ago. Q. That was about two years before her death? A. Yes, sir. Q. What did she say? A. Said she had made her will and given her grandchildren what she wanted them to have. Q. Who were her grandchildren? A. Miss Edenton Parks and Mr. Enoch Parks. Q. What relation were they to her? A. Step-grandchildren. Mr. Prichard married two sisters, and these were the children of his daughter by his first wife. Q. On this last occasion when she spoke to you about her will what disposition did she say she had made of it? A. She said she had made her will and she wanted the home place to go to Miss Edenton, the stores and some Tunica land also, and ten thousand dollars in money and some Tunica land to go to Mr. Enoch. She said she had promised Mr. Prichard that she would— Q. Just go ahead. A. She had already made the will. Q. You were telling about the disposition of the property. A. She said she gave Enoch ten thousand dollars because she did not send him off to school as she had promised to do because she needed him at home— Q. Tell anything else she had done with reference to the other heirs. A. She said she had made this will and

placed it in the vault in Memphis where she did business, but I don't know what bank that was. She said she was going to see that these two grandchildren would never be imposed upon and get their share of their grandfather's property. Q. What two grandchildren did she refer to? A. Miss Edenton Parks and Mr. Enoch Parks. Q. Did she refer to any other children? A. Said they had educated Mr. Moore's children. Mr. Prichard had; that she had with his money. Q. What did she say she had done with the balance of the property? A. She did not say. Q. Did she say whether or not this was all the property she had? A. She did not say. She just said that was what she was going to give these grandchildren because she had helped Mr. Moore's family already. Q. What did she say about the balance, if anything besides what you have just testified about; did she say that was all of the property or did she say what disposition she had made of it? A. That was not all the property, but she did not tell me about the other. Q. You say this was the last time you talked with her about the disposition of her property? A. Yes, sir. Q. How many times before that did she discuss with you the disposition of her property? A. I don't know how many times, but several times she had talked about it to me. Q. Mrs. Hardin, do you remember a circumstance that occurred about Christmas, 1903, with reference to Enoch Parks and Mrs. Prichard having a misunderstanding about his going to see a young lady? A. Very well. Q. Tell the jury about that.''

An objection was here again interposed by counsel for proponents.

''Q. State what occurred between Mrs. Prichard and Enoch Parks, Christmas, 1903, about his going to see a young lady? A. He was going to see a young lady and she did not want him to go. He spent the day and did not go back to Mrs. Prichard's home that night and she got very angry. In these spells she would get

so angry I guess she hardly knew what she was doing. He came to my mother's home that night and stayed there almost a week, and my mother taken him home. Q. Were you there when she took him home? A. No, sir. Q. You spoke of her getting in tantrums; did you ever see her in one? A. Yes, sir; I have seen her in them. Q. Do you know when she got in a tantrum and run a negro off the place? A. She would get in awful tantrums, when crossed; she had a very high temper; but when she would get in a good humor she would be awful sorry for what she had said or done. She was in one when she run the negro off. Q. What about when she liked anybody? A. She was awfully good when she liked you, but when she did not like you she did not mind showing it. Q. How long would these spells last? A. Sometimes a day or two. Q. Do you remember any others? A. I guess I could if I could just think about it. Q. Was it a matter of common knowledge in the community about her ungovernable temper? A. Yes, sir. Q. State any instances that you can think of where she displayed this violent temper; describe it to the jury. A. I have been there and saw her get very vexed at various times, and one time she run the hands off the place, and when she cooled down she would be so sorry and everybody always liked her; she would be pleasant and agreeable until she would get in one of those mad fits again."

On cross-examination she was asked:

"Q. You don't question her mentality because she got angry do you? A. Sometimes she would get so angry that she would be almost beside herself. Q. Now, Mrs. Hardin, can you identify the different times you were there when she got so angry? A. I was there at different times when she would get very angry. Q. Can you fix any certain time when you saw her in 1907? A. I think about Christmas. Q. Was it the time she

got so awfully mad with Enoch about going to see the young lady? A. I think so. Q. Was it 1906 or 1907? A. I believe 1906. Q. In what way can you fix that time? A. I don't know how. Q. You are satisfied it was 1906? A. Yes, sir. Q. Were you at Mrs. Prichard's that Christmas? A. Yes, sir. Q. How often? A. I don't know. Q. You were not there when she and Enoch had this row? A. No; I was at my mother's house. A. All you know about the row is what Enoch told you? A. Yes.; and when my mother carried him home. Q. And your mother told you? A. Yes, sir; and Mrs. Prichard told me afterward. Q. That is all you know about that is what was told you? A. Yes, sir. Q. As I understand, you were not present at the time of the fuss when Enoch went off and you did not go with him when he went back home? A. I was there during the week while he was gone. Q. You do not of your own knowledge know what was said when he left or when he got back? A. I know what they said. Q. But you were not there? A. While I was there in the week Mrs. Prichard told me herself. Q. She was in good humor then? A. Yes; but she told me how mad she had been with Enoch. Q. He provoked her greatly? A. Both of them provoked each other. Q. She had a strong mind? A. Only when she got mad, and then I guess she had no mind at all. Q. She had mind enough to transact her business, take out fire insurance, pay her bills, and collect her rents, didn't she? A. I should think so.''

At various and different times during a period of over ten years the testatrix, when she discussed the devising of her property with this witness, told her practically the same thing as to what she intended to devise to Enoch and Miss Edenton Parks and that she had placed her will in a vault in Memphis.

Mrs. Kate B. Elder, introduced by the contestants, was also a neighbor and good friend of the testatrix.

Over the objection of the proponents she testified that the testatrix told her she had a great deal of trouble about her land and that she had made a will.

"Q. Tell what she said. A. She said the property was entailed to her. It was to go to Mr. Prichard's two grandchildren. Q. Did she state that was what was done in the will? A. Yes, sir. Q. State what she said altogether. A. Said that she had a will and that was the way she had disposed of her property. Q. How frequently do you remember her having discussed this with you? A. On several different occasions; I could not say how many. Q. How long was that before her death, if you can fix the time? A. I should say something like ten or twelve months; might have been less time or longer. Q. Within a year of her death? A. Yes; I think so."

This witness further testified that Mrs. Prichard told her she had willed her property to her grandchildren, as she had promised Mr. Prichard she would do.

"Q. What was that promise? A. That she was to have the property only for her lifetime and then it was to go to his grandchildren."

In answer to a question this witness further stated that the testatrix told her the will was made in Coldwater—"but I don't know by who. Q. What was her condition as to mind and body? A. She was all right. Q. Was she ill in any way? A. No, sir. Q. That was some twelve months before she died? A. Yes, sir. Q. She was a woman of good mind? A. Yes, sir; of good executive ability. Q. She understood her business? A. Yes; but she was a woman of moods. Q. Did you ever see her when she could not attend to her business? A. She might, but I don't know whether it would be right or not when she was in a temper. Q. How did she say she had entailed this property? A. Said she had entailed it to the two Parks children. Q. Did she mention any part of it or the whole estate?

A. The whole estate; that she had willed the whole of it to them. Q. You know that Enoch had given her a great deal of trouble? A. I knew that they did not get along very well; boys are wild. Always said that all of the property would go to them; that it was entailed property. I understand that from Mrs. Prichard before he died, that he left it to her for her lifetime and at her death to go to these two grandchildren. Q. Mrs. Elder, you stated in direct examination before the jury was withdrawn that you had numerous conversations with Mrs. Prichard in reference to the disposition of her property, now state to the jury what disposition she said she made of it by will and why she made such disposition. A. She told me that she had willed it to her two grandchildren, Enoch and Edenton Parks; that she had helped her brother, bought the home and given it to him, educated his children, and given him the free use of her property in order to help him make a living; that he had never been able to do it before; that if the property went to him it would be dissipated, as his boys were crapshooters. Q. What statement did Mrs. Prichard make to you with reference to who she had received this estate from? A. From her husband; but I knew that already. Q. Tell the court what she told you. A. Said he had left it to her and that she had shortly after his death turned over everything to her brother, Mr. Moore, keeping only money and bonds for herself. Q. What statement did she make to you about receiving this property from her husband and for what purpose? A. Said she had received it for her lifetime. Q. And then what? A. That it was to go to his grandchildren; at her death all this property was to go to these two grandchildren, Enoch and Edenton Parks. Q. What did she say about an understanding she had with Mr. Prichard? A. That was the understanding and promise that at her death she was to leave all the property to those two grand-

children, Enoch and Edenton Parks. Q. When was the last conversation about her will? A. Something like a year before her death. I did not see her for a few months before she died. She made the statement as to the disposition of the property several times. Q. What did she say to you with reference to who wrote this will that was written in Coldwater? A. The only two names that I recall her speaking of in connection with the will was Mayes Daily and Dabney Turley; but whether either of them wrote the will or were the witnesses to the will I do not know. Q. Mrs. Elder, what was Mrs. Prichard's disposition with reference to being moody, showing temper, or being impetuous? A. Mrs. Prichard was a woman of moods; one day very cheerful and loving and the next day something would ruffle her and she would be off; of high temper and strong prejudice; if she liked you she liked you, and if she didn't she didn't. Q. What effect did that have on her reason? A. I can't answer that; she was a great friend of mine and never had a mood with me, but with the family she did. Q. Did you ever know her to leave home in one of these moods or tempers? A. No, sir. Q. What of her ability to attend to her business and have business transactions that require the exercise of reason while in one of these spells? (Objected to.) A. In one of these moods she was not capable of transacting business on account of violent temper."

In the first part of Mrs. Elder's testimony she testified that she came back from California seven years before Mrs. Prichard died. Mrs. Prichard died in 1916. Therefore Mrs. Elder must have returned from California in 1909. On cross-examination she was asked this question:

"Q. After you got back from California you did not hear of it until within a year of her death? A. Yes; she frequently talked to me about it. Q. When was the first time? A. Possibly in a few months after I re-

turned and possibly my first visit out there. Q. Did
you ask her about it? A. No, sir. Q. What did she
tell you about the disposition of her property the first
time she talked with you about it after you came back
from the West? A. Said she had not had one written;
that she would frequently write one herself, but had not
had one written.''

This conversation, according to the witness, evidently
occurred after 1909. The will witnessed by Gilliland
and Daily was made before this time.

Mrs. Mabry, a witness for contestants, testified as
follows:

''Q. Mrs. Mabry, what was the disposition of Mrs.
Prichard? A. She would have some bad spells some-
times. Q. What kind of spells? A. Just mad spells.
Q. When she would have one of those mad spells what
was her mental condition at that time with reference to
knowing or caring what she was doing? A. Sometimes
I thought she would not care what she did. Q. She
would get pretty mad? A. Yes, sir. Q. You know of
any special mad spell she had with any of her family?
A. She got mad with Enoch. Q. When was that? A.
In 1903. Q. What was the occasion of her getting mad
then? A. He was going to see a girl and she did not
want him to go. Q. Did she get mad about it? A. Yes;
because he went. Q. Did Enoch come to your house at
that time? A. Yes, sir; he stayed at my house nearly
a week, and I carried him back to his grandmother's.
Q. What did she say? A. Said she was glad I brought
him back; that she needed him. Q. What else did she
say? A. Just said she was awfully glad I brought him
home; that she needed him. Q. What time of year in
1903 was that? A. Along in the winter; bad weather
had set in. Q. Was it before or after the Christmas
holidays? A. I guess about the time of the holidays.
Q. What is it that fixes it in your mind that it was in
1903 that you took him home? A. Because he asked

me to go home with him. Q. Mrs. Prichard was a good woman, was she not? A. Yes, sir; she was a good woman. Q. Strong-minded and good business woman? A. Yes, sir. Q. She would get mad sometimes? A. Yes, sir.''

There was also testimony introduced for the contestants that after the writing of the will here in question the relations existing between Enoch and his stepgrandmother were cordial and friendly, and after Enoch married, though he did not continue to live with her, she would send for him and he would go down and help her with the management and care of her affairs.

The court refused a peremptory instruction requested by the proponents. The court also instructed the jury for the proponents that there was no testimony tending to show undue influence. The two questions really submitted to the jury were, first, the testamentary capacity of the testatrix, and, second, whether or not the will in question was revoked by a later will. The jury returned a verdict in favor of the contestants in accordance with which a decree was rendered.

The court was correct in not submitting the question of undue influence to the jury. There was no testimony whatever tending to show that in executing this will the testatrix was unduly influenced by her brother, R. R. Moore.

Upon the question of testamentary capacity, though the real issue for the determination of the jury is whether or not the testatrix possessed sufficient testamentary capacity when the will was executed, namely, December 25, 1903, at the same time, as is said in *Jackson* v. *Kniffen*, 2 Johns. (N. Y.) 31, 3 Am. Dec. 397, quoted with approval in the case of *Sheehan* v. *Kearney, supra*, 82 Miss. 694, 21 So. 43, 35 L. R. A. 102:

''In case of insanity or undue influence, the evidence takes a wider range, and here the subsequent as well as the prior declarations of the testator are admissible.''

In this case, upon this issue (testamentary capacity), all of the declarations and statements made by the testatrix to Mr. Daily at the time the alleged last will was executed to the effect that she desired to entail her property in accordance with the English laws, and the statements made to the three ladies to the effect that most of this property had been devised to Enoch and Edenton Parks, were admissible; also the statements to the witness that she only had a life estate in this property left her by her husband, and that at her death it was to go to these two grandchildren of her husband. Upon this issue (testamentary capacity) these statements are direct and primary evidence of the mental condition of the testatrix, to be considered along with the other testimony in the case. They are not evidence of the truth or falsity of the statements made. As stated on page 692 of the opinion in *Sheehan* v. *Kearney, supra.*

"Such declarations would seem to be declarations symptomatic of the condition of the mind, as exclamations forced by pain or disease from a suffering body are symptomatic of such pain and illustrative of its nature and cause. Irrational exclamations may thus well be symptomatic in one case of a diseased mind, and exclamations of physical pain and anguish in the other case of a diseased body, and competent in both cases, for the same reason, as primary evidence. 1 Greenl. Ev., page 149, section 102, and note c."

The burden of proof rested upon proponents to show the testamentary capacity of the testatrix. This burden was met, not only by the testimony of the witnesses introduced by proponents, but also by that introduced by the contestants.

All of the contestants' witnesses testified to the testamentary capacity of Mrs. Prichard ordinarily, but the real contention of the contestants is that she was subject to violent fits of rage and madness, and that when in one of these fits her reason was temporarily dethroned,

and that this will was written while she was in one of
those rages.   For this contention reliance is had prin-
cipally upon the testimony of the three lady witnesses,
which has been quoted practically in full on this ques-
tion.   Viewed in the strongest light favorable to the
contestants, the jury could only have inferred from this
testimony that Mrs. Prichard was subject to fits of mad-
ness, and that some of these spells of madness were of
such a character that her understanding and reason were
temporarily dethroned.   It is not shown that every time
she got mad her reason was dethroned.   Conceding all
of this to be true, however, the real question is, Was the
jury authorized, under this testimony, to believe that on
Christmas Day of 1903, when this will was executed by
her, she was in one of these mad spells, so mad that her
reason and understanding were temporarily dethroned?
The testimony upon which this conclusion must rest is
that of Mrs. Hardin and her mother, Mrs. Mabry.   While
Mrs. Hardin seems to think that the fuss with Enoch oc-
curred in 1906, yet we will assume that she is mistaken
in the date and that her mother is correct in saying that
it occurred in 1903.   They both say that it occurred dur-
ing the winter, along about Christmas time, during the
holidays.   Whether she became mad with Enoch before
or after Christmas is uncertain from their testimony.   It
is utterly impossible to say what length of time either
before or after the writing of this will this disagreement
came up.   Neither witness was present during the dis-
agreement;   consequently there is no testimony to show
whether Mrs. Prichard became so mad as to be beside
herself, or whether she was merely slightly angered at
Enoch because of his visiting the young lady.   Neither
witness saw Mrs. Prichard while she was mad with
Enoch at this time;   consequently there is no testimony
showing the extent of this rage.   What Enoch told these
ladies about his grandmother being mad is hearsay and
has no probative value.   From this testimony we only

know that several days after the fuss Enoch was taken back to his grandmother's home by Mrs. Mabry and that the grandmother stated she was glad to have Enoch back. She was not mad with Enoch at the time he was carried home, and neither of these witnesses saw her at this time while any mad spell was upon her. One of them states that Mrs. Prichard told her she had gotten mad with Enoch for going to see the girl—another in- stance of hearsay testimony of no probative value as to its truth or falsity.

Assuming, however that she was mad with Enoch when the will was written, was the jury justified in finding from the testimony, when considered with the terms of the will, that she was so mad that her reason was dethron- ed at the time of making the will? In *Brock* v. *Luckett,* 4 How. 483, the rule is stated that—"It is sufficient if he had a disposing mind, and was able to make a disposition of his estate with understanding and reason."

If at the time Mrs. Prichard made this will she under- stood and appreciated the nature of her act, the natural objects or persons of her bounty and their relations to her, and was capable of reasoning and thinking of how she desired to devise and bequeath this property, then she possessed the necessary testamentary capacity.

Considering the testimony in the case and the provisions of the will, it is perfectly plain that for some reason, caprice, or prejudice, we know not what, Mrs. Prichard had changed her mind and desired to leave Enoch only a very small part of her estate. In the will executed in May, 1903, she made provision for Enoch, Cordelia Edenton Parks, and her brother, R. R. Moore. In the Christmas will a number of the beneficiaries in the May will are also taken care of; the great difference only being in the devises and bequests to Enoch. The May will, which was satisfactory to all parties, was also in- consistent with the statements made to the three lady wit- nesses and to Mr. Dailey about leaving all of this

property to her husband's two grandchildren. In other words, while she was constantly telling one of these ladies that Enoch and his sister were to get all of the property, at that very time her will contradicted these statements.

According to this record the property devised was owned in fee simply by Mrs. Prichard. It was devised in this manner to her by her husband. It is true there is some contention about the property being left in trust to her by her husband. This phase of the case is not now before us, and the testimony about Mrs. Prichard's understanding that this property was so devised to her was only admissible on the issue of testamentary capacity.

It is a right guaranteed under our law to a party by will to dispose of his property (with certain limitations) in any manner in which he so desires. The reasonableness or unreasonableness, the naturalness, or unnaturalness, of the terms and conditions of this will are not to be considered by a jury, unless the mental condition of the testator is involved, namely, in issue of testamentary capacity and undue influence, one or both. But where the testimony shows the testamentary capacity of the testator and the absence of undue influence his will must be established.

As is said in the case of *King* v. *Rowan*, 82 Miss. 1, 16, 34 So. 325, 327:

. "It should be made clear to the jury that, however unreasonable and unnatural or unjust they may think the will is, they must uphold the will if, notwithstanding, they believe the testator had testamentary capacity, and was not unduly influenced."

Again, a little further on in the same opinion:

"The Supreme Court of California very accurately states our idea in *M'cDevitt's Case*, 95 Cal. 17, 30 Pac. 101, where the court said: "The right to dispose of one's property by will is most solemnly assured by law,

and is a most valuable incident to ownership, and does not depend upon its judicious use. 'The beneficiaries of a will are as much entitled to protection as any other property owners; and courts abdicate their functions when they permit the prejudices of a jury to set aside a will merely upon suspicion, or because it does not conform to their ideas of what is just and proper.' "

In *Burnett* v. *Smith,* 93 Miss. 566, 572, 47 So. 117, 118, this court said: "A man of sound mind may execute a will or a deed from any sort of motive satisfactory to him, whether that motive be love, affection, gratitude, partiality, prejudice, or even a whim or caprice."

The sanity of Mrs. Prichard was proven by all of the witnesses. It is not shown that her sanity was temporarily dethroned by rage at the time the will was executed. The terms of the will show that she was aware of her estate, the objects of her bounty, and knew how she wished to devise it. Considering the testimony of the contestants in connection with the terms of the will under which Enoch is left only fifty dollars and giving it its full weight, we are unable to agree with the chancellor that this question should have been submitted to the jury.

The next question presented to us is whether or not there was a revocation of the Christmas will by the execution of a subsequent will, either in 1906 or 1907, witnessed by Gilliland and Daily. The contention of the contestants is that, the execution of the will having been duly proven by the two witnesses, the testimony of the three ladies above referred to was admissible to prove its contents, and that this testimony showed that the property was devised and bequeathed in the last will in a different manner than in the will in issue; consequently, that these inconsistent devises in the last will revoked the Christmas 1903 will. There was no express clause revoking former wills proven by the

two witnesses.  The question here for determination is whether or not the contents of a lost will (its execution having been duly proven) may be proved by the declarations of the testatrix made to witnesses as to its contents.  Are those declarations admissible?  This question has received the most careful attention of the court, and an exhaustive investigation and study of the cases bearing upon it have been made.  The authorities in England and the different courts of this country are divided upon the question.  This court has never directly passed upon it.  That this character of testimony is hearsay testimony is admitted by all the authorities.  Some of them make an exception to the inadmissibility of hearsay testimony in cases of this kind.  The leading case favoring its admissibility is the English case of *Sugden* v. *St. Leonards,* L. R. 1 Prob. Div. 154, 251.

As stated elsewhere in this opinion, these declarations are held admissible upon the question of testamentary capacity by all the courts, and a majority of the courts, our own court being among the number, hold them admissible upon the question of undue influence.  In both of these instances, however, these statements are admitted as testimony, not for the purpose of establishing the truth or falsity of the statements made, but merely that the jury may consider them along with other testimony, and from all of the testimony arrive at a conclusion as to the mental condition of the testator at the time of making the will, viz., whether or not he was sane or unduly influenced at that time.  The inquiry in those two instances is as to the mental condition of the testator.  The truth or falsity of the statements is not under consideration at all.  *Sheehan* v. *Kearney, supra.*

The admissibility of these declarations is ably discussed and the authorities on both sides are cited in Wigmore on Evidence, vol. 3, secs. 1734-1737; Jones' Commentaries on Evidence, vol. 3, secs. 483, 484; 1 Alexander on Wills, secs. 360-362.

22—122 Miss.

We can add nothing to the able discussion of this question. Suffice it to, say that this testimony is hearsay, pure and simple, and subject to all of the objections of hearsay testimony.

The testatrix was under no. obligation whatever to truthfully state to these witnesses the contents of her will or wills. As a matter of fact, these declarations are shown by the testimony to have been at least misleading in some instances, viz., those made before the execution of the alleged lost will in 1906 or 1907. In this case they were only admissible as throwing light upon the testamentary capacity of the testatrix. They are of no probative value whatever to prove the contents of the alleged lost will. This rule is well stated in the case of *Shailer* v. *Bumstead*, 99 Mass. 112, 120:'

"Intention, purpose, mental peculiarity and condition, are mainly ascertainable through the medium afforded by the power of language. Statements and declarations, when the state of the mind is the fact to be shown, are therefore received as mental acts or conduct. The truth or falsity of the statement is of no consequence. As a narration, it is not received as evidence of the fact stated. It is only to be used as showing what manner of man he is who makes it."

Referring to the unreliability of declarations of this kind, it has been well said that—The testator "has neither the sanctity of an oath or the strong bond of self-interest to secure his adherence to the truth. The experience of every one must satisfy him that an inquiry made of a testator, as to the contents of his will, rarely elicits the truth. The evidence is clearly hearsay, and I cannot see upon what rational principle it can be made an exception to the rule excluding that species of evidence, unless it be that the devise is not a purchaser for a valuable consideration, and has no cause of complaint against the devisor, if he loses the estate devised by his untrue declarations, carelessly or wantonly made.

But it must be recollected that the controversy is not between the testator and the devisee, but between the heir and devisee, both claiming the property.'' *Boylan* v. *Meeker,* 28 N. J. Law, 283 et seq.

A particularly well-reasoned case is that of *Waterman* v. *Whitney,* 11 N. Y. 157, 62 Am. Dec. 71. It holds these declarations admissible only to show the mental condition of the testatrix and that they are hearsay and inadmissible for any other purpose.

The question before us is ably discussed in the opinion of the United States Supreme Court in the case of *Throckmorton* v. *Holt,* reported in 180 U. S. 552, 21 Sup. Ct. 474, 45 L. Ed. 663. The issues in that case were forgery and revocation, but the court considered fully the admissibility of this character of testimony, and refers to the cases on both sides of the question. Referring to the cases denying the admissibility of this testimony, it is said:

''In the cases contained in class A, it is held that declarations, either oral or written, made by a testator, either before or after the date of the alleged will, unless made near enough to the time of its execution to become a part of the *res gestæ,* are not admissible as evidence in favor of or against the validity of the will. The exception to the rule as admitted by these cases is that where the issue involves the testamentary capacity of the testator and also when questions of undue influence over a weakened mind are the subject of inquiry, declarations of the testator made before or after, and yet so near to the time of the execution of the will as to permit of the inference that the same state of mind existed when the will was made, are admissible for the purpose of supporting or disproving the mental capacity of the testator to make a will at the time of the execution of the instrument propounded as such. These declarations are to be admitted, not in any manner as

·proof of the truth of the statements declared, but only for the purpose of showing thereby what in fact was the mental condition, or, in other words, the mental capacity, of the testator at the time when the instrument in question was executed.''

Later on in the same opinion: ''It is quite apparent therefore that declarations of the deceased are properly received upon the question of his state of mind, whether mentally strong and capable or weak and incapable, and that from all the testimony, including his declarations, his mental capacity can probably be determined with considerable accuracy. Whether the utterances are true or false cannot be determined from their mere statement, and they are without value as proof of their truth, whether made by the sane or insane, because they are in either case unsworn declarations.''

After discussing the opinion in Sugden's Case, it is said: ''We are, however, convinced that the true rule excludes evidence of the kind we are considering. We remain of the opinion that the declarations come within no exception to the law excluding hearsay evidence upon the trial of an action, and we think the exceptions should not be enlarged to admit the evidence.''

Turning now to the authorities in Mississippi that have any bearing upon this question, in the case of *Tucker* v. *Whitehead*, 59 Miss. 594, the declarations of the testator were held admissible where the act of revocation was not shown to have been done by the testator. The statutory act of revocation being in that case equivocal, such declarations not made at the time of tearing off the name were admitted to make certain what otherwise was uncertain; that is, whether the name was torn off by the testator or a spoliator. The will being found among the effects of the testator with the name torn off, the presumption arose that this act was done by the testator, upon which arose the further presumption that it was done *animo revocandi,* and these dec-

larations were admitted to rebut these presumptions. The court in that opinion, however, was very careful to limit these declarations to a rebuttal of these presumptions.

*Sheehan* v. *Kearney* confines its decision to the admissibility of these declarations upon the question of testamentary capacity and undue influence, and is very careful to limit it to these two questions. This decision refers to *Tucker* v. *Whitehead.*

In *Miller* v. *Miller,* 96 Miss. 526, 51 So. 210, the statements of the testator upon the issue of forgery to the effect that he had not and would not make a will were held inadmissible. In the opinion the court, through Chief Justice Whitfield, said:

"The testimony offered to show declarations of the testator, to the effect that he would not make a will, was clearly incompetent, as mere hearsay. Wigmore on Evidence, vol. 3, section 1736. There is nothing to the contrary of what we have said on either of these points in *Sheehan* v. *Kearney.* . . . We held in that opinion . . . that the declarations of a testator as to his intentions with respect to the disposition of his property, made before or after the execution of the will, or at the time of the execution of the will, are competent, upon well-settled principles, on the issue of undue influence and the issue of insanity. Those are not the issues in this case."

This testimony is hearsay, and was not admissible to prove the contents of the alleged lost will. In order to show a revocation of the Christmas, 1903, will, not only the execution of this alleged lost will must be proven but also its contents, showing inconsistent devises and bequests with the 1903 will. *Hoy* v. *Hoy,* 93 Miss. 732, 48 So. 903, 25 L. R. A. (N. S.) 182, 136 Am. St. Rep. 548, 17 Ann. Cas. 1137; *Garrett* v. *Dabney,* 27 Miss. 335; *Hairston* v. *Hairston,* 30 Miss. 276.

But the contents of this will cannot be proven by the hearsay declarations of the testatrix. The court erred in submitting the question of the revocation of the will to the jury. The Christmas, 1903, will was conclusively shown to have been wholly written and signed by the testatrix and found among her effects after her death. There being no testimony of undue influence and no testimony showing a lack of testamentary capacity at the time the will was executed, the peremptory instruction requested by proponents should have been granted.

The decree of the lower court is reversed and the cause remanded.

*Reversed and remanded.*