**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2002-CA-01705-SCT**

*IN THE MATTER OF THE ESTATE OF GARLAND
LADNER, DECEASED:*
*FRED LADNER AND JACK PARSONS*

*v.*

*LUTHER LADNER*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/1/2002 |
| TRIAL JUDGE: | HON. JOHNNY LEE WILLIAMS |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | TADD PARSONS |
| | JACK PARSONS |
| ATTORNEY FOR APPELLEE: | RICHARD C. FITZPATRICK |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 11/10/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., EASLEY AND CARLSON, JJ.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     This appeal involves an apparent deep-seated family feud between two brothers, Fred and Luther Ladner. When a third brother, Garland, died, a dispute between Fred and Luther arose regarding the ownership of certain livestock. Threats of violence were made, and Fred, as executor of Garland's estate, obtained an order from the chancery court permitting him to retrieve the livestock from Luther's property and directing the sheriff to accompany him. Guns were brandished, and Luther was arrested. After the dust settled, the chancellor found that Garland had made inter vivos gifts of part of the livestock and that Fred and his attorney, Jack

Parsons, violated M.R.C.P. 11 and the Litigation Accountability Act because they failed to inform the court of Luther's claims of ownership when they obtained the order for seizing the livestock. As a result of this violation, the chancellor awarded Luther attorney's fees and expenses in the amount of $2500 to be paid by Fred and Parsons. We find that the chancellor was correct and affirm.

## FACTS

¶2. Fred Ladner filed a petition to probate the Last Will and Testament of Prentiss Garland Ladner. Fred, one of Garland's brothers, was named executor in the will. The estate consisted of, among other things, certain livestock[1] which were located on real property owned by a third brother, Luther Ladner. Fred requested permission from the chancery court to remove the livestock from Luther's property and take the cattle to a stockyard for processing. He also alleged that, after Garland's death, Luther went onto Garland's property and removed five horses, a cattle trailer, saddles, bridles, blankets, a big screen television and a VCR. Fred requested the chancery court to order Luther to return the horses and the other items to him so he could distribute the same according to the will.

¶3. The chancery court issued letters testamentary to Fred and ordered the Sheriff to assist Fred in retrieving the livestock and personal property from Luther. While Fred was retrieving the livestock, firearms were brandished, and Luther was arrested.

¶4. After the livestock were removed from Luther's property, Luther sent notices to two stockyards contesting the ownership of the cattle and ordering the stockyards not to sell them. Fred, as executor, filed suit in the chancery court against Luther, Heber Ladner and Camille

---

[1]Eighteen cows, 14 calves and 4 horses.

Martin, for an order directing the three defendants to release certain property (cattle, a television, a VCR, and horses) belonging to the estate. Thereafter, the court ordered Fred not to dispose of any estate property, including the livestock. Luther filed a response to the complaint and a counterclaim, alleging that Fred should be removed as executor and that he violated the Litigation Accountability Act, Miss. Code Ann. §§ 11-55-1 to -15 (Rev. 2002), and demanding damages, attorney's fees and costs.

¶5. After a hearing, the chancellor entered findings of fact and conclusions of law in which he found as follows:

1. Garland's will bequeathed his estate to his siblings, for them to share equally.

2. The complaint filed by Fred did not inform the court of Luther's alleged ownership of the livestock.

3. The evidence overwhelmingly showed that Garland owned the cattle at the time of his death and that Luther was merely allowing them to graze on his property.

4. The evidence showed that Luther removed the personal property from Garland's house after Garland's death; therefore there was no inter vivos gift.

5. Garland did make an inter vivos gift of the horses to Luther and Camille Martin. Supporting this finding are documents signed at Garland's direction and the fact that Luther cared for Garland towards the end of his life.

6. Fred and his attorney Jack Parsons knew or had reason to know of others' claim of possession and ownership of the livestock.

7. The fact that Luther did not actually own the cattle did not shield Fred and Parsons from liability.

8. Luther's arrest and the "strong arm" divestment of the livestock were performed without any legal authority.

3

9.      The actions of Fred and Parsons violated the Litigation Accountability Act[2] and M.R.C.P. 11.[3]

---

[2]Miss. Code Ann. § 11-55-5 (Rev. 2002) provides in pertinent part:

(1)     [T]he court shall award . . . reasonable attorney's fees and costs against any party or attorney if the court . . . finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification, or that the action, or any claim or defense asserted, was interposed for delay or harassment . . . .

* * *

(3)     When a court determines reasonable attorney's fees or costs should be assessed, it shall assess the payment against the offending attorneys or parties, or both . . . .

(4)     [Attorney's fees may be assessed against parties or] an attorney licensed to practice law in this state . . . [if they] clearly knew or reasonably should have known that such party's action, claim or defense or any part of it was without substantial justification.  Miss. Code § 11-55-3(a) (Rev. 2002) provides: "'Without substantial justification' . . . means that it is frivolous, groundless in fact or in law, or vexatious, as determined by the court."

[3]M.R.C.P. 11(b) provides in part:

If any party files a motion or pleading which, in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay, the court may order such a party, or his attorney, or both, to pay to the opposing party or parties the reasonable expenses incurred by such other parties and by their attorneys, including reasonable attorneys' fees.

4

**STANDARD OF REVIEW**

¶6.    We cannot interfere with or disturb a chancellor's findings of fact unless those findings are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. *G. B. "Boots" Smith Corp. v. Cobb*, 860 So. 2d 774, 776-77 (Miss. 2003); *Pilgrim Rest Missionary Baptist Church ex rel. Bd. of Deacons v. Wallace*, 835 So. 2d 67, 71 (Miss. 2003). The standard of review for questions of law is de novo. *Parkerson v. Smith*, 817 So. 2d 529, 532 (Miss. 2002).

**DISCUSSION**

### I.    WHETHER THE CHANCELLOR ERRED WHEN HE REMOVED FRED AS EXECUTOR.

¶7.    Fred and Parsons argue that executors may not be removed unless a conflict of interest arises between the executor and the estate or when the executor fails to perform properly his duties. *In re Chambers*, 458 So. 2d 691 (Miss. 1984). Fred alleges that he was merely attempting to garner the assets of the estate and that his actions were not in conflict with the estate's interests. He points out that he had reason to request the Sheriff's assistance because Luther had stated that things would become violent if Fred attempted to seize the subject property.

¶8.    Miss. Code Ann. § 91-7-85, removal or resignation of fiduciary, provides that executors may be removed "if he become disqualified, or for improper conduct in office. . . ." The chancellor found that Fred "employed the strong arm of this Court to wrest control of cattle and horses off the land of Luther Ladner, which also precipitated Luther Ladner's arrest by law enforcement." We find that Fred's misrepresentation of the true facts (i.e., Luther's claims of

5

ownership) to the court amounted to "improper conduct" under the statute, and we affirm the chancellor's removal of Fred as executor of Garland's estate.

## II. WHETHER THE CHANCELLOR ERRED IN DETERMINING THAT INTER VIVOS GIFTS OF THE HORSES HAD BEEN MADE.

¶9.     A party attempting to prove that an inter vivos gift was made must show the following by clear and convincing evidence: (1) that the donor was competent to make a gift; (2) that the donation was a voluntary act and the donor had donative intent; (3) that the gift must be complete and not conditional; (4) that delivery was made; and (5) that the gift was irrevocable. *In re Estate of Holloway*, 515 So. 2d 1217, 1223 (Miss. 1987) (*superceded on other grounds by statute*).

¶10.     Fred contends that neither title to nor possession of horses was delivered to Luther. He alleges that the horses were still in Garland's possession at the time of his death. However, there was undisputed testimony that Garland directed Camille Martin to fill out a form transferring the horses to Luther and to Martin's daughter. He also directed Martin to sign his name on the form. Others heard Garland say that he wanted Luther and Martin's daughter to have the horses. Martin testified that she handled all paperwork related to the horses for Garland prior to his death and that it was common practice for Garland, who was paralyzed, to instruct others to sign paperwork in his name.

¶11.     There was conflicting testimony, however, about whether the horses were on Garland's property or Luther's property at the time of Garland's death. The chancellor found that the horses were on Luther's property, and this finding is supported by evidence.

6

¶12.    However, on appeal, Fred claims that the horses were on Garland's property; therefore there was no delivery of the inter vivos gift.    Delivery and relinquishment of control are requisites of an inter vivos gift.    "A delivery either actual, constructive, or symbolical is an element essential to the validity of a[n inter vivos gift]." ***Thomas v. Eubanks' Estate***, 358 So. 2d 709, 713 (Miss. 1978) (citing ***Johnson v. Grice***, 140 Miss. 562, 106 So. 271 (1925); ***Pace v. Pace***, 107 Miss. 292, 65 So. 273 (1914)).   One of the essentials of a valid inter vivos gift that the property must be delivered in such manner that the donor retains no control or dominion over it. ***Thomas***, 358 So. 2d at 713.

¶13.    We find that it does not matter whether the horses were found on Luther's property or Garland's property, because a valid inter vivos gift was made.   Garland instructed that papers be drawn up to transfer ownership and directed Martin to sign the papers for him.   Even if the horses were on his property, the evidence shows that he was paralyzed and Garland clearly could not exercise any right of ownership to the horses.   The testimony unequivocally shows that Luther took care of the horses and that he and Martin and Martin's daughter rode the horses.

¶14.    We find no error in the chancellor's finding that Garland made a valid inter vivos of his horses to Luther and to Martin's daughter.

### III.    WHETHER THE CHANCELLOR ERRED WHEN HE FOUND THAT THE LITIGATION ACCOUNTABILITY ACT AND M.R.C.P. 11 HAD BEEN VIOLATED.

¶15.    The chancellor, in finding that the Litigation Accountability Act and M.R.C.P. 11 had been violated, awarded $2500 in attorneys fees and expenses to Luther, to be paid by Fred and

7

Parsons.  The imposition of sanctions raises a question of law, the standard of review of which is de novo.  *Amiker v. Drugs For Less, Inc.*, 796 So. 2d 942, 945-46 (Miss. 2001).  Fred and Parsons contend that Fred "rightfully called the police to keep the peace and prevent injury" because Luther had "brandished weapons and threatened" Fred.  However, testimony was introduced at trial that Luther and Fred had at least two confrontations about the ownership of the livestock prior to the will being probated.  The record shows that the complaint made no mention of the fact that Luther claimed ownership of the livestock.  Furthermore, Parsons sent a certified letter to Luther in which Luther's threats against Fred were mentioned.  Therefore, Parsons knew or reasonably should have known that Luther alleged ownership of the livestock, and he made no effort to bring this fact to the chancellor's attention.

¶16.  Neither Fred nor Parsons introduced any evidence that they did not know of Luther's claimed ownership.  We find that Fred and Parsons had no substantial justification for their actions and that their procuring the order to seize the livestock was frivolous under the circumstances.  Both Fred and Parsons knew that Luther had claims to ownership of the livestock and failed to inform the chancellor of this vital act.  The chancellor states that the order was entered on the basis of the misrepresentations of Fred and Parsons.

¶17.  Because they misrepresented pertinent facts which were within their knowledge to the chancellor, who entered an order based on the misrepresentations, Fred and Parsons violated the Litigation Accountability Act and M.R.C.P. 11.

¶18.  The separate opinion posits that the chancellor, in finding that Fred and Parsons had violated the Litigation Accountability and M.R.C.P. 11, attempted "to shift the entire blame to Fred and his attorney," and was in error to have signed the order permitting Fred to enter

Luther's land to gain possession of the cattle. This issue is not raised by either party in this appeal. The only issues raised by Fred and Parsons concerning the chancellor's order pertain exclusively to the claims that the chancellor abused his discretion because Fred and his attorney had legal authority to do what they did.

¶19. The separate opinion states that the chancellor did not support his findings with facts. The order appointing Fred as executor, which was prepared by Parsons, states:

> The Court finds further that FRED LADNER by and is hereby authorized to dispose of the cattle and horses that were left by the decedent since the decedent had only a few acres of land and was using the property of his brother, LUTHER LADNER, at the time of his death to run his cattle on **and that there is no person that is in a position to care for the animals.**

(Emphasis added.) Fred was in a position to know that Luther and his family had been taking care of the cattle; however this information was not given to the chancellor, and in fact, the allegation that no one was taking care of the cattle implied that there were no claims of ownership of the cattle except for that of the Estate.

¶20. In the order entered after the hearing, the chancellor specifically stated:

> The true nature of the dispute between Fred Ladner, Executor and Luther Ladner is borne out in a letter dated April 16, 2002, from Jack Parsons, attorney on behalf of Fred Ladner, Executor, to Luther Ladner. This letter was sent certified and it enclosed the Judgment of the Court. It was copied only to Fred Ladner and David Earl Johnson, Chancery Clerk of Pearl River County. **It was not copied to the Court.** Significantly, the letter stated that Luther Ladner had said he would shoot anyone going on his property to get horses and cattle. The letter warned Luther Ladner of the consequences of resisting the Court's Judgment. **The Court was first made aware of the letter and its contents on June 19, 2002, when it was introduced at trial as Exhibit "3."**

9

(Emphasis added.)

¶21.    These excerpts from the record make clear that, in failing to give the chancellor all relevant information about the cattle, misrepresentations were made.  Neither Fred nor Parsons challenge the chancellor's statement that he was not aware of all of the circumstances surrounding the ownership of the property.  It is not this Court's place to second-guess a chancellor's findings when the parties have not.

## CONCLUSION

¶22.    Finding no error in the chancellor's findings of fact and conclusions of law, we affirm the chancellor's judgment.

¶23.    **AFFIRMED.**

**SMITH, C.J., COBB, P.J., EASLEY, CARLSON, GRAVES AND RANDOLPH, JJ., CONCUR.  DICKINSON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.  DIAZ, J., NOT PARTICIPATING.**


**DICKINSON, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶24.    The majority is quite correct, I believe, in holding that the chancellor did not err in finding Garland made a valid inter vivos gift of his horses.  Therefore, I concur to that extent.  However, it seems to me the chancellor erred in holding than Fred and his attorney violated the Litigation Accountability Act and M.R.C.P. 11, and in removing Fred as executor.  Therefore, I respectfully dissent to that extent.

¶25.    On April 16, 2002, Fred filed a Complaint to Probate the Last Will and Testament of his late brother, Garland.  The Complaint stated in part:

10

Your Plaintiff shows further that the decedent, GARLAND LADNER, died possessed of certain real and personal property, some of which had been taken by other parties and at the present time is left 18 cows, 14 calves and a bull and 4 horses. The cows, calves and bull should be taken to the stockyard for disposal immediately. The cattle are presently located on LUTHER LADNER'S land, a brother of the decedent, and the court should direct that Luther Ladner release the animals to the Executor so they could be sold at a public sale at the Hattiesburg Stockyard or at the Lucedale Stockyard, whichever is more convenient and where the holding of the cattle can be arranged on the date of the sale. Your Executor should be given permission to secure the serves of a person or persons to load the cattle, haul them to the stockyard and sell them and be authorized to pay the fee for doing so. In fact, the court order should permit the stockyard to withhold the funds to pay for hauling of the cattle. The stockyard will send a truck and trailer to pick up the cattle and deliver them to the yard to be present at the sale and would withhold the transportation and loading costs out of the proceeds of the sale. Your Plaintiff shows the quarter horses that are left are very nice animals and, in fact, all but one (1) was registered and the papers have been taken by another party, thought to be Luther Ladner. Luther Ladner went on the property of the decedent, GARLAND LADNER, after his death and picked up five (5) horses, one (1) of which was delivered to CAMILLE MARTIN. Luther Ladner should be required to return the horses. Luther Ladner took the cattle trailer and all the saddles, bridles, blankets, etc. that belonged with the horses. All this property belonged to the decedent, GARLAND LADNER. In addition to this, Luther Ladner took the big screen television and the VCR and these items should be returned to your Plaintiff so that he can make disposition of same in accordance with this Court's order.

* * *

. . . The Court should enter an order directing the Sheriff of Pearl River County or one of his deputies or a constable to marshal these assets so they can be disposed of as directed by the Court.

¶26. On the same day, the trial court entered a Judgment Appointing Executor which appointed Fred as the Executor and provided in pertinent part:

The Court finds further that the Complaint stated that certain parties had taken personal property that belong to the estate and that FRED LADNER is authorized to request that the personal property be returned to him as Executor to be disposed of in accordance with the order of this Court. The Court finds that the parties failing to do so, then, FRED LADNER is authorized to file

11

appropriate pleadings in this Court to request the Court to hear and determine who is the true and legal owner of the personal property.

The Executor is further authorized to bring any and all action necessary to secure possession and try ownership of any and all property belonging to the decedent's estate.

The Court finds further that FRED LADNER be and is hereby authorized to dispose of the cattle and horses that were left by the decedent since the decedent had only a few acres of land and was using the property of his brother, LUTHER LADNER, at the time of his death to run his cattle on and that there is no person that is in a position to care for the animals. The Court finds that the Executor should take the cows to either Hattiesburg Stockyard or Lucedale Stockyard for sale and is authorized to retain the services of the stockyard to have people come pick up the cattle, haul them to the yard and the yard will deduct the charges incurred for their services from the sale price of the cattle and the remaining funds should be paid to FRED LADNER as Executor of the estate of his deceased brother, GARLAND LADNER. The Court finds the Executor may sell said horses at the public auction either at either of the stockyards or at the horse sale in Mize, MS or any other public horse sale wherein the prices of the animals will be value of the animals at public sale. The Court finds that out of the proceeds, the Executor or the yard will withhold the commissions for performing these services and the remainder will be placed into the estate to be divided upon conclusion of the estate.

* * *

IT IS FURTHER ***ORDERED that the Sheriff assist the Executor or his designees in securing the cattle and/or horses off the land of Luther Ladner, if needed***, so the cattle and horses may be penned, picked up and sold as hereinabove set out. ***The Sheriff or Deputy or Deputies shall render assistance in keeping the peace while the cattle and horses are gathered*** and penned even though the animals are on the land of Luther Ladner or anyone else. The Sheriff and his officers are directed to keep the peace.

(emphasis added).

¶27. On April 21, 2002, accompanied by law enforcement, Fred went to Luther's property to take possession of the livestock. Luther did not consent. This resulted in an altercation which led to Luther's arrest.

12

¶28. The next day, Luther's attorney wrote letters to the stockyards, informing them of the dispute, and warning them not to dispose of the livestock. A copy of the letters were sent to the chancellor, the court clerk and Fred's attorney.

¶29. That same day, the chancellor held a hearing on the matter, and ordered Fred not to dispose of the livestock until further order of the Court. The matter was set for trial on June 19, 2002.[4]

¶30. Following the trial, the chancellor rendered his Findings of Fact and Conclusions of Law, wherein he purported [5] to address the "issue of whether the Judgment of the Court exceeded its legal authority in granting Fred Ladner the power to take possession and dispose of the cattle and horses in a way that is inconsistent and inimical to the law."

¶31. The trial court concluded that Luther had valid title to the horses, but not the cattle or other items claimed by Luther. The trial court then addressed whether Fred and his attorney, Jack Parsons violated the Litigation Accountability Act and Rule 11:

---

[4]Subsequent to Fred taking possession of the livestock and the hearing on April 22, 2002, he filed another complaint on April 26, 2002 which paragraph IV stated:

Your Plaintiff shows that on or about April 16, 2002, LUTHER LADNER, told the attorney for the estate, JACK PARSONS, that he would shoot anyone that went upon the property to get the cows and horses that belonged to GARLAND LADNER and that the animals are on his property under lock and key. Your Plaintiff firmly believes that LUTHER LADNER is so deranged and so possesses with ownership of the animals that was left by his late brother, GARLAND LADNER, that he would, in fact, shoot anyone that would attempt to go onto the property to secure the animals.

The complaint prayed that the matter be set for a hearing to determine the ownership of the animals.

[5]Although the chancellor specifically stated the issue he intended to address, he never made a finding of whether the court exceeded its authority.

13

The fact that Luther Ladner did not own the cattle does not shield Fred Ladner, Executor, and his attorney, Jack Parsons, from the consequences of their actions. The fact remains that Fred Ladner, Executor, and his attorney, Jack Parsons, employed the strong arm of this Court to wrest control of cattle and horses off the land of Luther Ladner, which also precipitated Luther Ladner's arrest by law enforcement. This was all done without a legal foundation and in violation of the Litigation Accountability Act and Rule 11.

* * *

Fred Ladner, Executor, and his attorney, Jack Parsons, had less drastic measures available. They could have gotten an emergency temporary restraining order preventing Luther Ladner from disposing of the cattle and horses, and set a hearing before the court on the issue of ownership. But not only did their actions give no notice to Luther Ladner, they confiscated Luther Ladner's property, prevented Luther Ladner from having his day in court and precipitated his arrest. Further, the process was even more abusive because the initial complaint did not support the Court's Judgment of April 16, 2002. For these reasons, court proceedings were wrongly used by Fred Ladner, Executor, and his attorney, Jack Parsons, to deny Luther Ladner his legal rights and the confiscation of his property.

¶32. The trial court was correct, I believe, in that the initial complaint did not support the Court's Judgment of April 16, 2002. However, it is harsh and unfair to shift the entire blame to Fred and his attorney. This is especially so, I think, since we are given no explanation of why the chancellor entered the order to begin with. The only misrepresentation we are told about is that Fred and his attorney "knew or had reason to know of Luther Ladner's claim of possession and ownership." The chancellor further states that Fred and his attorney had "less drastic measures" available to them.

¶33. The record before us indicates nothing beyond the contents of the Complaint was presented to the chancellor when he signed the order allowing Fred, accompanied by the "Sheriff or Deputy or Deputies" to enter Luther's property and take the livestock. That being the case, it seems to me we should be asking why the chancellor signed the order, not why Fred

14

and his attorney asked for it. The Complaint clearly falls far short of compliance with the requirements for a temporary restraining order, or order of seizure, without notice to Luther. Again, I am persuaded that we should be asking why the order was signed, rather than why it was requested.

¶34. If the chancellor is claiming he has a reasonable basis to assert that Fred and his attorney intentionally and willfully lied to the court, I find nothing in the record to substantiate such a claim.

¶35. The charge against Fred and his attorney I find most tenuous, is the chancellor's statement that "the process was even more abusive because the initial complaint did not support the Court's Judgment of April 16, 2002." If the chancellor signed an order which was not justified by the complaint, it seems we should be looking to the one who signed the unsupported order.

¶36. Furthermore, rebutting the chancellor's assertion that the court was not informed of the dispute, or Luther's claim of ownership, I find the following in the complaint:

1. ". . . the court should direct that Luther Ladner release the animals to the Executor. . . ."

2. "Luther Ladner went on the property of the decedent, Garland Ladner, after his death, and picked up five (5) horses. . . ."

3. "Luther Ladner should be required to return the horses."

4. Plaintiff prays ". . . this Court . . . direct that he proceed to . . . require people that are in custody of this property summoned to appear at a date certain for a hearing on said ownership of said property."

Additionally, the following is found in the chancellor's order:

15

1. "The Court finds further that the Complaint stated that certain parties had taken personal property that belong to the estate . . . ."

2. "The plaintiff has attached to the Complaint a list of personal property that was ***thought to be owned***[6] by the decedent and is authorized to take whatever actions necessary to secure said property . . . ." (emphasis added).

3. "The Sheriff or Deputy or Deputies shall render assistance in keeping the peace[7] while the cattle and horses are gathered and penned, even though the animals are on the land of Luther Ladner or anyone else. The Sheriff and his officers are directed to keep the peace."

¶37. In light of these statements, I see little to justify sanctions against Fred or his attorney, or to justify his removal as executor, based upon misconduct. Conversely, I see much to indicate that the chancellor should not have signed the order without notice to Luther, and a hearing. Therefore, on the issues of violation of the Litigation Accountability Act, Rule 11 sanctions, and I would reverse and render the chancellor's judgment. Accordingly, I respectfully concur in part and dissent in part.

---

[6]For reasons unexplained, the chancellor's Judgment then proceeded to grant Fred the authority to take possession of, and dispose of, this personal property "thought to be owned by" the decedent.

[7]Why would the Sheriff need to "keep the peace" if there were not conflicting (and hostile) claims to the property?