KING, C.J.,
for the Court.
¶ 1. This appeal arises from a judgment of the Madison County Chancery Court in favor of Deborah Steverson against her two sisters, Connie Eldridge and Polly Weaver, who filed a complaint seeking an accounting of the assets of the parties’ deceased mother, Lucille Hart. The chancellor denied the objection to the final accounting and denied the claims of heirs. The Appellants[1] filed a motion for a new trial and other relief. The chancellor denied the motion and directed Steverson to file and serve a final accounting and to close the estate on or before June 30, 2007. Aggrieved, the Appellants appeal and argue the following assignments of error: (1) the chancellor erred in analyzing the contested transfers and transactions using an undue-influence analysis; (2) the chancellor erred in allowing the contested transfers and transactions to stand; (3) the chancellor erred in ruling that Hart had a full understanding of her finances and affairs; and (4) the chancellor erred by not ordering Steverson to pay the charges incurred for services of the court-appointed expert. Finding no error, we affirm.
FACTS
¶ 2. When Hart retired from the restaurant business in the early 1990s, she owed a substantial amount of money to the Internal Revenue Service. At the time, Hart’s only source of income was approximately $565 per month social security benefits. In 1993, in an effort to alleviate her financial woes and supplement her income, Hart made an agreement with Steverson to secure a joint loan in the amount of $65,000. In exchange for assisting Hart to secure the loan and to make it easier for *751 Steverson to make the monthly loan payment of $625, Hart gave Steverson approximately $32,000. Steverson used these funds to pay off her personal debt; which would in turn make it easier for her to meet the monthly loan obligation. Hart used some of her real estate, specifically the School Street property, as security for the loan. Hart was negotiating a sale of the School Street property to the City of Ridgeland; therefore, she anticipated that the need for the loan would be short term. The record indicates that during the negotiations, Hart gave Steverson a durable power of attorney on June 25,1997.
¶ 3. The sale of the property did not occur as expeditiously as Hart and Stever-son had anticipated. As a result, Hart and Steverson refinanced the 1993 loan in 1998 for $75,000. Approximately $54,327 from the 1998 loan was used to pay off the original loan, and $20,672 was given to Steverson, who again would make the monthly payment on the loan. That monthly loan payment was $787.
¶ 4. In December 2000, Hart sold the School Street property to the City of Ridgeland for approximately $340,000. The proceeds from the land sale were disbursed as follows: $71,823 was used to pay off the 1998 loan; $10,000 was used to pay attorney’s fees; $5,000 was used to pay Steverson’s credit card debt which was used to pay appraisal fees during the negotiations for purchase of the School Street property; and $100,000 and $150,000, respectively, were placed in two new bank accounts, which were opened jointly in the names of Hart and Steverson.
¶ 5. Also, in December 2000, from proceeds from the sale of the School Street property, Hart gave $10,000 to each of her daughters and $10,000 to her daughters’ husbands or boyfriend. In January 2001, Hart gave Weaver an additional $10,000 to assist with her plans to build a home. Hart also offered to give Eldridge an additional $10,000 at that time, but she refused the gift. When Eldridge refused the gift, Hart gave $5,000 to each of Eldridge’s two children.
¶ 6. On February 24, 2001, Hart executed a will naming her daughters, Stever-son, Eldridge, and Weaver as the beneficiaries. Hart’s real and personal property was to be disbursed as follows: the house and property at 141 Meadowdale Drive, Madison, Mississippi was devised equally to Eldridge and Weaver; the house and property at 694 Old Rice Road, Madison, Mississippi was devised equally to Stever-son and her husband Billy; and the remainder of the estate, real and personal, was devised and bequeathed equally to Steverson, Eldridge, and Weaver. Stever-son was named as the executrix.
¶ 7. In March 2001,[2] Hart agreed to purchase Steverson’s home, which was the Meadowdale property, to use as rental property, and Steverson would get one acre of Hart’s property located at 289 Woods Road, Madison, Mississippi to build a new home. The purchase of this property was to be an investment for Hart. Hart purchased the property from Steverson for $90,000, but no consideration was given for the one acre Steverson received to build her home.
118. On June 29, 2002, Hart died. On July 18, 2002, Steverson filed a petition to probate Hart’s will. The will was admitted to probate on July 18, 2002. On November 6, 2002, the Appellants filed a complaint which alleged that Steverson misappropriated and mismanaged Hart’s assets *752 and requested an accounting from the date Hart gave Steverson power of attorney until her death. The Appellants also requested that the chancellor order Hart’s estate to be kept open until a full accounting had been conducted.
¶ 9. On December 3, 2002, Steverson filed her first and final accounting of all receipts and disbursements made during the course of her administration of Hart’s estate. On March 6, 2003, the Appellants filed an objection to the accounting submitted by Steverson. On April 14, 2004, the chancellor directed Steverson to provide a complete accounting of her actions under the power of attorney from Hart from when it was granted until the time of Hart’s death. In addition, the chancellor appointed the accounting firm of Koerber Turner PLLC as an independent auditor to conduct a forensic investigation of Hart’s finances prior to and after her death. At the conclusion of trial on July 26, 2006, the chancellor took the case under advisement. Subsequently, on October 30, 2006, the chancellor denied the Appellants’ objections to the final accounting and their contests of the claims of heirs. The Appellants filed a motion for a new trial and other relief, which was denied on June 7, 2007.
STANDARD OF REVIEW
¶ 10. “We cannot interfere with or disturb a chancellor’s findings of fact unless those findings are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.” In re Estate of Ladner, 909 So.2d 1051, 1054(¶ 6) (Miss. 2004) (internal quotations omitted). “The standard of review for questions of law is de novo.” Id.
ANALYSIS
I.Whether the chancellor erred in analyzing the contested transfers and transactions using an undue-influence analysis.
II. Whether the chancellor erred in allowing the contested transfers and transactions to stand.
III. Whether the chancellor erred in ruling that Hart had a full understanding of her finances and affairs.
¶ 11. Because these three issues involve the validity of the contested transfers and transactions, they will be discussed together. The contested transfers and transactions in this case are as follows: (1) the $48,338.20 to pay off Steverson’s mortgage; (2) three $20,000 gifts transferred to Steverson dated April 2001, June 2001, and January 2002; (3) several cash withdrawals between December 2000 and January 2002, totaling $4,330 from an account bearing Hart’s and Steverson’s names with no known purpose; and (4) two transfers totaling $7,700, to Stever-son’s personal account in December 2002 as reimbursements for Hart’s funeral expenses. The parties acknowledge that Steverson had a fiduciary and confidential relationship with Hart. The Appellants argue that these contested transactions violated that fiduciary and confidential relationship.
¶ 12. “The law in [Mississippi] on fiduciary or confidential relationships and undue influence is well settled.” Howell v. May, 983 So.2d 313, 317(¶ 14) (Miss. Ct.App.2007). “Its application has been made to both inter vivos and testamentary transactions.” Id. Determining whether an inter vivos gift is valid, is a two-step process. Id. at 318(¶ 14). The first step, involves the plaintiff seeking to set aside the inter vivos gift and to demonstrate by clear and convincing evidence that a confidential relationship existed between the grantor and grantee. Id. In this case, the parties stipulated that a fiduciary and con- *753 Sciential relationship existed between Hart and Steverson because of the close relationship between Steverson and Hart and the assistance Steverson provided Hart in meeting her personal and financial needs. “Where a confidential relationship exists, there is a presumption of undue influence concerning an inter vivos gift.” In re Estate of Reid, 825 So.2d 1, 5(¶ 13) (Miss. 2002). “Such gifts are presumed invalid.” Id. “Once a confidential relationship is found, the burden shifts to the beneficiary to disprove the presumption of undue influence by clear and convincing evidence.” Id. at (¶ 14). To overcome the presumption of undue influence, the proponent(s) must show the following: “(1) good faith on the part of the grantee/beneficiary; (2) grantor’s/testator’s full knowledge and deliberation of [her] actions and their consequences; and (3) independent consent and action by the grantor/testator.” Wright v. Roberts, 797 So.2d 992, 999(¶23) (Miss. 2001).
¶ 13. The Appellants argue that the chancellor failed to use the proper legal analysis in determining whether the transactions were the product of undue influence, thus, allowing the contested transfers and transactions of Hart’s assets to stand. The Appellants assert that the chancellor stated that the burden rested on Steverson to prove by clear and convincing evidence that the gifts and transfers of money to Steverson and her husband, Billy, were not a product of undue influence. However, the Appellants contend that the analysis should have begun with the presumption that any transfers or gifts are void. The Appellants contend that the chancellor’s analysis applies to testamentary gifts and deeds rather than inter vivos gifts. Additionally, the Appellants claim that Hart did not have a full understanding of her finances and affairs; instead, she was under the undue influence of Steverson when certain gifts and transfers of money occurred.

A. Good Faith

¶ 14. There are five factors to consider when determining whether the grantee/beneficiary acted in good faith:
(a) the determination of the identity of the initiating party in seeking preparation of the instrument, (b) the place of the execution of the instrument and in whose presence, (c) what consideration and fee were paid, if any, and (d) by whom paid, and (e) the secrecy or openness given the execution of an instrument.
Holmes v. Holmes-Price, 961 So.2d 674, 682(¶ 25) (Miss.2007).
¶ 15. The record indicates that Hart’s decision to purchase the Meadowdale property and use it as rental property was the result of a conversation between Hart and Steverson. The purchase was viewed as an investment for Hart. Steverson testified that a discussion she had with Hart about the good market price Steverson’s neighbors had received from the sale of their home resulted in Hart’s idea that she would purchase Steverson’s home and use it as rental property. Tammy Smith, Hart’s granddaughter, testified that Hart purchased Steverson’s home as an investment. Smith stated that Hart wanted to use the Meadowdale property as rental property and use the rental income for paying her living expenses and giving gifts to her grandchildren. Donald McCraw, Steverson’s attorney, testified that Stever-son contacted him to assist with the paperwork for the sale of the Meadowdale property. McCraw also stated that Hart consulted Attorney John Toney, who had assisted Hart with the sale of the School Street property, regarding the purchase. McCraw testified that the day the deed was executed he had a thorough conversa *754 tion with all the parties involved in the purchase and sale of the property to make certain that the parties understood the transaction. McCraw stated that Hart was happy about the purchase. McCraw testified that Hart and Steverson had agreed that no money would be exchanged from the sale, but that Steverson would remove the funds from the proceeds from the sale of the School Street property account as needed. Steverson explained the funds from the sale of the Meadowdale property to Hart was expended in the following manner: $48,388.20 was used to pay off the first and second mortgages; $1,600 was used for house plans; $50 was used for a sewer septic system permit; $4,119 was used for site preparation to build Steverson’s new home; $2,412.80 was used for builders’ fees for construction; another $1,500 was used for builders’ fees for construction; and $20,000 was transferred to Steverson’s personal bank account. The purchase of the Meadowdale property was transacted openly. Eldridge, Weaver, and Smith testified that Hart informed them that she was buying the house on Mead-owdale.
¶ 16. The record indicates that Hart initiated the three $20,000 gifts transferred to Steverson on April 2001, June 2001, and January 2002. Steverson testified that Hart’s original plan in selling the School Street property was to give each of her daughters, Steverson, Eldridge, and Weaver $10,000 a year until all the money was gone. These transactions did not occur because of a disagreement among Hart, Eldridge, and Weaver. Eldridge testified that there was a disagreement between her and Hart, but it was resolved prior to Hart’s death. Smith testified that each daughter and her spouse/boyfriend received $10,000 in December 2000, and Weaver received an additional $10,000 after Christmas because Weaver was building a house. Smith stated that Hart wanted to make it equal, so she planned to give Steverson and Eldridge an additional $10,000. Smith testified that Hart informed her that she was giving Steverson and Billy an additional $10,000 each. Smith stated that Eldridge refused to take the additional $10,000, so Hart divided it between Smith and her brother. Smith also stated that she does not recall Hart giving Eldridge or Weaver any additional money. Steverson stated that one $20,000 payment was part of the $90,000 from the sale of the house in order to pay for contractual services and the other two $20,000 were gifts from the sale of the School Street property.
¶ 17. Steverson stated that the several cash withdrawals between December 2000 and January 2002, in the amount of $4,330 from an account bearing Hart’s and Stev-erson’s names, were expended on Hart’s daily living expenditures and two transfers to Steverson’s personal account in the amount of $7,700 in December 2002 were reimbursements to Steverson for Hart’s funeral expenses and headstone. Stever-son testified that $7,864 was spent on Hart’s funeral and $2,016.50 was spent on a headstone for Hart’s grave. Steverson claimed that she paid for Hart’s funeral expenses then reimbursed herself later out of one of Hart’s accounts. The record does indicate that Steverson purchased a cashier’s check in the amount of $7,864 payable to Wright & Ferguson Funeral Home. In addition, Steverson claimed that the cash withdrawals were spent on food, home improvements, medicine, utilities, medical bills, credit card payments, home improvement supplies, and Christmas gifts. Although Steverson presented no receipts showing how the funds were specifically spent, Smith testified that Hart preferred to pay individuals in cash and would often remind Steverson to get money to pay individuals who were performing *755 home improvement projects at her home. Hart also only liked to conduct her affairs in cash; she paid for medicine and food in cash, and she gave cash gifts. Steverson provided an itemization of those expenses. Hart’s beneficiaries and other family members were aware of Hart’s generosity in sharing her money and the proceeds from the sale of her real property. Moreover, the record indicates that Hart relied on Steverson to assist her in transacting self-initiated personal activities. The Appellants provided no evidence to indicate that Steverson did not act in good faith as to the sale of Steverson’s home and the other contested transactions.

B. Full Knowledge and Deliberations

¶ 18. The following factors are considered in determining whether the grantor had full knowledge and deliberation of her actions and their consequences:
(a) [her] awareness of [her] total assets and their general value, (b) an understanding by [her] of the persons who would be the natural inheritors of [her] bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether non-relative beneficiaries would be excluded or included and, (d) knowledge of who controls [her] finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on [her] and how susceptible to [her] influence.
Holmes-Price, 961 So.2d at 684(¶ 39).
¶ 19. The record indicates that Hart had full knowledge of her assets, her natural inheritors and who controlled her finances. Weaver testified that it was not out of the ordinary for one of Hart’s daughters to write a check for Hart in order to transact Hart’s personal business. Steverson, Weaver, Eldridge, and Smith all testified that Hart possessed sharp mental capabilities until a few days prior to her death. Weaver stated that Hart knew that there was enough money in her accounts to give a gift of $20,000 in December 2000 and a gift of $10,000 in January 2001.
¶ 20. Smith testified that Hart relied on Steverson to manage her finances and that Hart was aware that Steverson mainly managed her bank accounts via the Internet. Smith recalls not only trying to assist Hart in understanding the Internet banking system, but also she helped Steverson set up electronic banking for Hart. Stever-son testified that she and Hart would reconcile the bank statements. Smith stated that Hart discussed her finances at the house and was aware of how much money she had received from the sale of the School Street property. Smith testified that she would often assist Hart by taking Hart to purchase items or run errands for Hart. Smith stated that although Hart preferred to use cash, on occasion Hart would use a credit card or give her a credit card to purchase items or pick up her medication from the drugstore.
¶ 21. The record indicates that Hart had full knowledge of her finances and business. Witness testimony indicates that Hart may have needed some assistance with writing checks for her daily needs, paying for home improvements and repairs, giving gifts, withdrawing funds, and balancing her accounts; and she would solicit the help of Steverson, Smith, Weaver, and Eldridge to perform those tasks. However, the evidence clearly indicates that Hart was fully aware of her assets and her heirs. The Appellants offered no evidence to dispute that Hart was fully aware of her assets and heirs.
*756 C. Independent Consent
¶ 22. The last prong in determining whether Steverson overcame the presumption of undue influence by clear and convincing evidence is whether Hart exhibited independent consent and action. Steverson must prove that Hart sought “advice of (a) a competent person, (b) disconnected from the grantee, and (c) devoted wholly to the grantor/testator’s interest.” Mullins v. Ratcliff, 515 So.2d 1183, 1193 (Miss.1987).
¶ 23. Testimonial evidence indicates that Hart was a competent person who was fully aware of her assets. Smith and Steverson testified that the bank transfers and transactions were performed under Hart’s direction. The monetary gifts to Hart’s daughters and their husbands and boyfriend, payments for home improvements and repairs, and inter vivos gifts to others were given without any direction from another. Hart purchased the Mead-owdale property as an investment. The record indicates that the purchase of the Meadowdale property was the result of a discussion between Hart and Steverson. Although McCraw, who had done legal work for both Steverson and Hart, was instrumental in the sale and purchase of the Meadowdale property, Hart also consulted Attorney Toney, a non-interested person, regarding her investment.
¶ 24. A summary of Hart’s bank records indicates how the proceeds from the sale of the School Street property were disbursed. Although the accounting of the transactions and transfers presented to the chancellor did not contain receipts indicating the specifics of how the funds were spent, the evidence indicates that Hart acted independently. Smith testified that Hart preferred to pay her bills in cash and that she was aware of her actions in making the gifts she gave. There is no evidence in the record to dispute this testimony.
¶ 25. Evidence reveals that all possible beneficiaries of Hart were aware of the inter vivos gifts to her children and them spouses and boyfriend and grandchildren, and that Hart initiated these gifts without any direction. Hart was aware of her assets and relied on Steverson to assist her in conducting her financial transactions. The record supports the chancellor’s finding that Steverson overcame the presumption of undue influence by clear and convincing evidence. Thus, we find that the chancellor’s decision was supported by substantial credible evidence. Therefore, this issue is without merit.
IV. Whether the chancellor erred by not ordering Steverson to pay the charges incurred for the services of the court-appointed expert.
¶ 26. Jim Koerber, k certified public accountant, was appointed as an expert by the trial court to gather documentation relating to Hart’s assets from June 25, 1997, to June 29, 2002, and then report his findings to the chancery court regarding the contested transactions. The Appellants assert that they paid Koerber’s retainer fee of $5,000. The Appellants argue that the chancellor abused his discretion and committed manifest error by not directing Steverson to pay any and all charges incurred by and for Koerber.
¶27. Mississippi Rule of Evidence 706(b) provides that “compensation [for the court-appointed expert] shall be paid by the parties in such proportion and at such time as the court directs, and thereafter charged in like manner as other costs.” “The assessment of court costs is within a chancellor’s sound discretion; however, as a general rule, the costs of court should be assessed against the losing party.” Leaf River Forest Prods. Inc., v. *757 Rowell, 819 So.2d 1281, 1285(¶15) (Miss. Ct.App.2002). On May 23, 2005, the Appellants filed the motion to have an independent auditor appointed by the chancery court. In their motion, the Appellants requested that the auditor be compensated pursuant to Rule 706. Thus, the Appellants were aware that the chancery court had the authority to direct them to pay the expenses of the independent auditor. Accordingly, we find that the chancellor did not err in ordering the Appellants to pay all the incurred charges by the court-appointed auditor. Therefore, this issue is without merit.
CONCLUSION
¶ 28. There is sufficient credible evidence to support the chancellor’s finding that Steverson rebutted the presumption of undue influence regarding transfers and transactions performed by Steverson as to Hart’s assets. We find that the chancellor did not abuse his discretion by failing to direct Steverson to pay for charges incurred for the services of the court-appointed auditor requested by the Appellants. Therefore, we affirm the chancellor’s judgment.
¶ 29. THE JUDGMENT OF THE CHANCERY COURT OF MADISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.

. Unless the distinction needs to be made, Eldridge and Weaver will be collectively referred to as the Appellants throughout this opinion.

. The agreement for purchase of the Meadow-dale Drive home was reached prior to Hart's execution of her will on February 24, 2001; however, the warranty deed was not executed until March 20, 2001.