# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-00719-SCT

*THE ESTATE OF JAMES M. LAUGHTER:*
*RUBYE C. FOSTER*

*v.*

*MARJORIE WILLIAMS*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/03/2008 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD, JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ROY O. PARKER, JR. |
| ATTORNEY FOR APPELLEE: | KENNETH E. STOCKTON |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | REVERSED AND REMANDED - 09/24/2009 |
| MOTION FOR REHEARING FILED: | 10/29/2009; DENIED AND OPINION MODIFIED AT PARAGRAPHS 7, 10, 35 AND 36 |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., RANDOLPH AND CHANDLER, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Rubye C. Foster appeals the decision of the DeSoto County Chancery Court granting summary judgment in favor of Marjorie Williams. The chancellor's order upheld the validity of a will of James M. Laughter, Williams's brother, against a challenge by Foster. Foster also appeals the chancellor's order, entered prior to summary judgment, determining that a promissory note allegedly given by Laughter to Foster during their marriage was an asset of Laughter's estate.

¶2.     Finding genuine issues of material fact exist with respect to the testamentary capacity of Laughter and potential undue influence by Williams, we reverse and remand for a trial on the merits as to these issues. Also, because we find Laughter made a valid *inter vivos* gift of the promissory note to Foster, we reverse the decision of the chancellor holding that the note should have been included in Laughter's estate.

## FACTS & PROCEDURAL HISTORY

¶3.     In 2003, Laughter sold a business he owned and the land on which it was situated to David Adams. As payment, Adams provided Laughter with a promissory note for $100,000, payment of which was secured by a deed of trust. Laughter and Adams later amended the promissory note and the sales contract to provide that, upon Laughter's death or inability to accept payment, any remaining payments would be made to Rubye C. Foster. Both Adams and Laughter initialed the amendments to the note and the sales contract.

¶4.     Foster and Laughter were married at the time the sale and the amendment were made. Foster asserts that Laughter presented her with the amended note and the deed of trust on their anniversary, Valentine's Day of 2004, and told her, "this is your present." Thereafter, Foster retained possession of the documents, keeping them at her home.

¶5.     On March 2, 2005, Laughter and Foster were divorced, allegedly for financial reasons,[1] but they continued to live together. On March 3, 2005, Marjorie Williams,

_____

[1] Foster asserts that she and Laughter agreed to get divorced because Laughter was suffering from respiratory problems and pneumonia, and Laughter did not want the doctors or hospitals to be able to seek payment from Foster for the extensive medical procedures he was about to undergo.

2

Laughter's sister, got Laughter to execute a quitclaim deed, giving Williams sole ownership, for one dollar, of a lot jointly owned by Laughter and Williams.

¶6. On March 4, 2005, Laughter executed a will in the offices of his attorney, Phillip Stroud. The will named Foster as executrix and bequeathed all of Laughter's property to Foster, except the lot that he owned jointly with Williams, the same lot he had deeded to Williams the day before. In this March will, Laughter specifically devised to Foster his property interest in the deed of trust, "together with the indebtedness secured thereby, which is further evidenced by [the] Promissory Note." The meeting with Stroud, at which Laughter and Stroud discussed the will and Laughter signed it, was videotaped.

¶7. Also on March 4, 2005, Laughter and Foster executed a warranty deed, conveying ownership of Laughter's home to himself and Foster "as joint tenants with full right of survivorship and not as tenants in common." Within the week, Laughter was admitted to the hospital, and on March 11, 2005, he granted power of attorney to Williams. Laughter was later transferred to a nursing home.

¶8. On March 28, 2005, Williams's attorney, Randy Garner, sent Foster a letter instructing her to transfer her interest in the home deeded to Foster on March 4 back to Laughter. The letter explained that Williams and Garner "cannot find where [Laughter] remembers ever executing a deed giving you a joint tenancy . . . to his home." The letter stated that Laughter had signed the deed at a time when he was "extremely ill and unable to handle his affairs." The letter stated that if Foster did not comply, Williams would pursue legal action.

3

¶9. Jack Nazary, a minister, visited Laughter in the hospital in April of 2005. Nazary provided a sworn affidavit stating that Laughter had told him during the visit that "nothing ha[d] changed" with his relationship with Foster. Laughter stated that he had "been looking for [Foster] everyday [sic]."

¶10. In May of 2005, Williams made arrangements for another attorney, Gerald Chatham to assist Laughter in preparing a new will. On May 4, Chatham met Laughter at the nursing home, where Laughter executed a new will. In this May will, Laughter named Williams as executrix and bequeathed the balance of his promissory note to Lauren Elizabeth and Kaitlyn Elise Roberts.[2] Laughter devised the rest of his property, including his home, to Williams. The meeting with Chatham, at which Chatham and Laughter discussed the new will and Laughter signed it, also was videotaped. Laughter died on July 2, 2005.

¶11. In September 2005, Foster and Williams filed petitions for probate of the March will and the May will, respectively. In August 2006, the two cases were combined.

¶12. That December, Foster filed a motion for declaratory judgment asking that the promissory note be removed from Laughter's estate because it was an *inter vivos* gift to her. Foster also refiled an earlier motion asking the court to view the videotapes that were taken at the execution of the two wills. On April 13, 2007, the chancellor denied both motions, finding that the motion regarding the videotapes was premature and that the promissory note "is in fact an asset of the Estate of James M. Laughter . . . ."[3]

---

[2] The Robertses have been identified as Williams's granddaughters.

[3] The chancellor did not expressly find that the note was not an *inter vivos* gift. However, the chancellor's order was in response to Foster's motion for declaratory judgment, which asserted that Laughter had given Foster the note as a valid *inter vivos* gift.

¶13.   On August 10, 2007, Williams moved for summary judgment to confirm the validity of the May will.  A hearing was held on September 5, at which Chatham and Williams both testified.  On September 13, 2007, the chancellor granted the motion for summary judgment. Thereafter, Foster filed a motion for a new hearing, which the chancellor denied.

¶14.   On March 7, 2008, Williams was appointed executrix of Laughter's estate pursuant to the May will.  Williams immediately moved to strike Foster's original probate claim, which motion was granted on March 19, following a hearing.

¶15.   On April 3, 2008, the chancellor issued an order enjoining Foster from filing any further motions, except an appeal.  Thus, on April 24, Foster appealed, asking this Court to compel that the videotapes of the two wills be included in the record on appeal and viewed by the Court.  This Court denied the motion, holding that it needed to be filed in the chancery court.  Foster did so, and on November 13, 2008, the chancellor denied the motion on the ground that no proper predicate had been laid for the tapes' introduction.

¶16.   Foster appeals the chancery court's grant of summary judgment in favor of Williams confirming the validity of the May will.  Foster asserts that summary judgment was erroneously granted because: (1) there is a genuine issue of material fact concerning Laughter's testamentary capacity when he executed the May will; (2) there is a genuine issue of material fact regarding whether Williams unduly influenced Laughter in the making of the May will; (3) the chancellor erred in refusing to admit the videotapes; and (4) the chancellor erred in limiting argument at the summary judgment hearing to fifteen minutes.

---

Thus, the chancellor's order finding the promissory note to be an asset of Laughter's estate impliedly rejected Foster's argument that the note was an *inter vivos* gift.

5

Additionally, Foster asserts that the chancellor erred in deciding that the promissory note should be included in Laughter's estate and thus was not an *inter vivos* gift to her.

## DISCUSSION

**I.   Whether summary judgment was granted erroneously.**

¶17.   Our appellate standard for reviewing a trial court's grant or denial of summary judgment is the same standard as that of the trial court under Rule 56(c) of the Mississippi Rules of Civil Procedure.

> We employ a de novo standard of review of a trial court's grant or denial of a summary judgment and examine all the evidentiary matters before it–admissions in pleadings, answers to interrogatories, depositions, affidavits, etc.  The evidence must be viewed in the light most favorable to the party against whom the motion has been made.  If, in this view, there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law, summary judgment should forthwith be entered for the movant. Otherwise, the motion should be denied.

*Bullock v. Life Ins. Co.*, 872 So. 2d 658, 660 (Miss. 2004) (citing *Hurdle v. Holloway*, 848 So. 2d 183, 185 (Miss. 2003)).  Concurrently, at the trial-court level, when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials set forth in his pleadings, but his response . . . must set forth specific facts showing that there is a genuine issue for trial."  Miss. R. Civ. P. 56(e).[4]

---

[4]   Williams has moved this Court to strike portions of Foster's brief and record excerpts, alleging that they contain information that was not properly before the court below. We reserved decision on that motion for our final opinion in this case. This Court has held that portions of a brief that cite evidence not in the record must be stricken. *Brown v. State*, 965 So. 2d 1023, 1027 (Miss. 2007) (citing *Pulphus v. State*, 782 So. 2d 1220, 1224 (Miss. 2001)).  However, in assessing the merits of this appeal, we have determined that every evidentiary matter this Court cites herein is included in the record and was filed with the chancery court well before the chancellor's decision granting summary judgment.  Further, "a summary judgment motion is based on the pleadings and any affidavits, depositions, *and*

A.    *Whether there is a genuine issue of material fact concerning Laughter's testamentary capacity when he executed the May will.*

¶18.   The burden of proving testamentary capacity is on the proponents of the will, who can present a prima facie case simply by offering into evidence the will and the record of probate. ***In re Last Will and Testament and Estate of Smith***, 722 So. 2d 606, 610-11 (Miss. 1998) (citing ***In re Estate of Edwards***, 520 So. 2d 1370, 1372-73 (Miss. 1988)).  Once a prima facie case has been established, the burden of going forward shifts to the contestants to overcome the prima facie case.  ***Id.*** at 611.

¶19.   Since the May will has been properly admitted to probate, Williams has presented such a prima facie case.  Therefore, the burden shifts to Foster to show that Laughter lacked testamentary capacity at the time of the will.

20.    Testamentary capacity is determined based on three factors: (1) whether the testator had the ability at the time of the will to understand and appreciate the effects of his act; (2) whether the testator had the ability at the time of the will to understand the natural objects or persons to receive his bounty and their relation to him; and (3) whether the testator was capable of determining at the time of the will what disposition he desired to make of his property.  ***In re Estate of Holmes***, 961 So. 2d 674, 679 (Miss. 2007) (citing ***Smith***, 722 So.

---

*other forms of evidence* relative to the merits of the challenged claim or defense that are *available at the time the motion is made*."  Miss. R. Civ. P. 56 cmt. (emphasis added). The chancellor recognized as much when, at the summary judgment hearing, he stated that his decision would be based not only on the pleadings and the testimony offered at the hearing, but on "all matters filed" in the cause. Thus, all the sources relied upon herein were available to the chancellor and presumably were considered by him when making his decision on Williams's motion for summary judgment.  Williams's motion to strike, therefore, is dismissed as moot.

2d at 610). However, evidence need not fall squarely under any one of these factors in order to be pertinent. *See, e.g., Smith*, 722 So. 2d at 611.

¶21. Excluding allegations based on the videotapes, Foster has raised three arguments to rebut the presumption that Laughter possessed testamentary capacity. First, Foster asserts that the letter sent on behalf of Williams by her attorney, Garner, dated March 28, 2005, admitted Laughter's lack of capacity. The Garner letter described Laughter as "extremely ill and unable to handle his affairs," and it stated that Laughter was unable to remember deeding his home to Foster, as a joint tenant with himself only three weeks earlier.[5]

¶22. The mere fact that someone is too ill to handle his affairs does not in and of itself render him mentally incompetent or void of testamentary capacity. *See Lee v. Lee*, 337 So. 2d 713, 715 (Miss. 1976) (citing *Thomas v. Hamlin*, 404 S.W.2d 569 (Tenn. Ct. App. 1964)). However, Laughter's alleged inability to remember deeding joint ownership of his home to Foster only three weeks earlier is evidence of a potential lack of capacity. The Garner letter's implication that Laughter had signed the deed only because he was "extremely ill and unable to handle his affairs" apparently was made to show that the deed of March 4, 2005, was invalid because of Laughter's incapacity.

¶23. Second, Foster points out that the May will "completely changed the distribution of Laughter's assets" from the March will. This Court has held that a prior will, if made at a time when the testator possessed testamentary capacity, may be admitted into evidence to

---

[5] Although this letter is likely inadmissible hearsay and no proper predicate was laid for its introduction, there was no objection to its being referenced in the court below. Also, neither party has objected to it on appeal, and this Court does not address such issues *sua sponte*. *See, e.g. Derouen v. State*, 994 So. 2d 748, 750-51 (Miss. 2008) (appellate review of hearsay requires contemporaneous objection).

show a lack of testamentary capacity at the time of a subsequent will. *Perry v. Aldrich*, 196 So. 2d 521, 525 (Miss. 1967). Prior statements by the testator may be similarly relevant. *Moore v. Parks*, 122 Miss. 301, 332, 84 So. 230, 237 (1920).

¶24. Here, Williams has not formally challenged Laughter's competency at the time he executed the March will. However, the March will was executed on the same day, March 4, as the deed of Laughter's home to Foster. As discussed above, the Garner letter implies that the deed is invalid because of Laughter's poor health at that time. Thus, it is possible that Williams impliedly challenges the validity of the March will because it was executed on the same day as the deed.

¶25. Any such challenge, however, would be disingenuous. Williams does not challenge Laughter's capacity to execute the quitclaim deed to Williams, done only one day before, on March 3. Presumably, any alleged inability of Laughter to appreciate the effects of his March 4 will also would invalidate the March 3 quitclaim deed to Williams.

¶26. Laughter's March will was entirely different from his May will. The March will devised nearly all of Laughter's property to Foster, whereas the May will, drafted only two months later, devised nearly all of Laughter's property to Williams. These changes were made even though Jack Nazary recounted that when he visited Laughter in the hospital in April of 2005, Laughter stated that "nothing had changed" with his relationship with Foster.

¶27. The differences between the March and May wills raise questions regarding Laughter's capacity. The dramatic extent of the changes to his will may indicate that Laughter did not remember the prior will or understand how the proposed changes would affect it legally. Thus, the March will, as well as other evidence of Laughter's intent, such

9

as the Nazary affidavit and the amendment to the promissory note, create a question of material fact as to Laughter's testamentary capacity at the time he executed the May will.

¶28. Foster additionally argues that Laughter did not have the ability to appreciate the effects of his May will because he devised several items that she claims he did not own. Whether an attempted devise of unowned property is enough to call into question a testator's testamentary capacity is apparently an issue of first impression in Mississippi.[6] Because Foster has presented other evidence sufficient to raise a genuine issue of material fact, however, we need not decide this issue at this time.

¶29. Taking the evidence in the light most favorable to Foster, as we must, we find that the evidence presented is enough to raise a genuine issue of material fact regarding Laughter's testamentary capacity at the time of the May will. The chancellor's grant of summary judgment therefore was erroneous.

> B.    *Whether there is a genuine issue of material fact regarding whether Williams unduly influenced Laughter in the making of the May will.*

¶30. Foster argues that Laughter had a confidential relationship with Williams. If true, this could create a presumption of undue influence, which Williams would then have to rebut with clear and convincing evidence. *In re Estate of Reid*, 825 So. 2d 1, 5 (Miss. 2002) (citing *In re Estate of Dabney*, 740 So. 2d 915, 921 (Miss. 1999)).

---

[6] Other jurisdictions have commonly held that such errors provide "no ground . . . for controversy over" the issue of testamentary capacity. *Fissel v. Fissel*, 105 N.E. 756, 757 (Ill. 1914) (attempt to devise entire farm in which testator only owned a half-interest); *accord State v. Goodman*, 181 S.W. 312, 320 (Tenn. 1915) (will referenced "real estate" in its residuary clause, when testator owned none). *But see Mircovich v. Mircovich*, 703 S.W.2d 325, 326 (Tex. App. 1985) (attempt to bequeath property no longer owned cited by expert as evidence of brain damage).

¶31. A confidential relationship is "a relationship between two people in which one person is in a position to exercise dominant influence upon the other because of the latter's dependency on the former arising either from weakness of mind or body, or through trust[.]" *Id.* (quoting *Hendricks v. James*, 421 So. 2d 1031, 1041 (Miss. 1982)). Whether a confidential relationship exists is determined based on the following factors:

> (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.

*In re Estate of Holmes*, 961 So. 2d 674, 680 (Miss. 2007) (citing *Wright v. Roberts*, 797 So. 2d 992, 998 (Miss. 2001)).

¶32. Here, Williams has conceded that Laughter was cared for by others. At various times, especially during the last few months of his life, Laughter was cared for by Williams, Foster, the hospital, and the nursing home.[7]

¶33. Williams also had a close relationship to Laughter. Williams was Laughter's sister, and she testified that she "had always looked after him because [she] was the older of the two, and he had been [her] responsibility after [their] parents passed away to help as much as [she] could." *See Wright*, 797 So. 2d at 998 (close relationship found on the basis of being related and having had a long friendship). Williams also testified that she had brought

---

[7] While factors 2, 3, 4, and 7 refer to the party who allegedly unduly influenced the testator, both textual interpretation (*i.e.*, the use of the term "others" rather than "another") and caselaw indicate that the first factor can include care by any person, not just the person against whom undue influence is claimed. *See Dabney*, 740 So. 2d at 919 ("Also, the testatrix had to be taken care of by other individuals [than the beneficiary][.]").

11

Laughter food when he was sick prior to his entering the hospital, and that after he entered the hospital, she stayed with him there.

¶34. Also, there is evidence suggesting that Laughter was physically and mentally weak. The Garner letter stated that Laughter was "very ill and unable to handle his affairs" and had been since the time of his divorce from Foster. As discussed above, the letter also indicated that Laughter could not remember deeding a joint ownership in his home to Foster a mere twenty-four days earlier.

¶35. Laughter was nearly eighty years old and in poor health at the time of the May will, as well. Williams conceded as much. Laughter had been hospitalized for two months and was in the nursing home, where he would pass away two months later. It is also undisputed that Laughter had given power of attorney to Williams.

¶36. In this case, therefore, at least five of the seven factors used to determine whether a confidential relationship exists are present. There is evidence that Laughter was physically and/or mentally weak, of advanced age, and in poor health. He was taken care of by others, and had given power of attorney to Williams, who maintained a close relationship with him. Therefore, we find that there is a genuine issue of material fact regarding whether Laughter was sufficiently dependant on Williams to create a confidential relationship between them.

¶37. The mere existence of a confidential relationship, however, is not in itself sufficient to raise a presumption of undue influence. *Wright*, 797 So. 2d at 999 (quoting *Croft v. Alder*, 237 Miss. 713, 723-24, 115 So. 2d 683, 686 (1959)). Such a presumption would arise only in certain circumstances. These circumstances are:

12

> where the beneficiary has been actively concerned in some way with the preparation or execution of the will[;] or where the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator; or where the beneficiary in the confidential relation was active directly in preparing the will or procuring its execution, and obtained under it a substantial benefit.

*Croft*, 237 Miss. at 723-24, 115 So. 2d at 686 (1959) (internal citations omitted).

¶38. In this case, Williams was not actively involved in the execution of the May will. In fact, she was not even in the room when it was executed. But this does not end the inquiry. The Garner letter's statements that Laughter was "extremely ill and unable to handle his affairs" and that Laughter did not remember deeding his home to Foster suggest that Laughter may have lacked mental capacity as early as March 28. This is evidence that Laughter may have had a mental infirmity.

¶39. Moreover, Chatham testified that he was originally contacted by Williams, via Garner, and that Williams had made the arrangements for Chatham to meet with Laughter to execute the May will. This, coupled with the extent of Williams's benefits under the May will, is consistent with what we have termed "suspicious circumstances." *See **In re Last Will and Testament and Estate of Smith***, 722 So. 2d 606, 612 (Miss. 1998) (citing ***In re Estate of Harris***, 539 So. 2d 1040, 1041 (Miss.1989)) (beneficiaries drove testatrix to the attorney's office).

¶40. Therefore, viewing the evidence in the light most favorable to Foster, we find that sufficient evidence was presented such that there is a genuine issue of material fact regarding whether Laughter and Williams had a confidential relationship and whether Laughter was thus unduly influenced by Williams.

13

C.    *Whether the chancellor erred in refusing to admit the videotapes submitted by Foster.*

¶41.    Foster claims that the chancellor erred in refusing to admit the videotapes of the sessions in which Laughter executed the March and May wills. Foster contends that these tapes demonstrate the deterioration of Laughter's health and help to prove her claim that the May will is invalid due to a lack of testamentary capacity and/or undue influence.

¶42.    A trial judge is granted "broad discretion" in his evidentiary determinations. *Jones v. State*, 920 So. 2d 465, 475 (Miss. 2006). This Court will not overturn such a determination unless the judge abused his discretion to such an extent as to be prejudicial to one of the parties. *Copeland v. Copeland*, 904 So. 2d 1066, 1073 (Miss. 2004) (quoting *Stewart v. Stewart*, 645 So. 2d 1319, 1320 (Miss. 1994)).

¶43.    Before a videotape may be admitted into evidence, the party attempting to introduce it must properly authenticate it. To do this, the proponent of the tape must prove three elements: "[r]elevancy of the subject matter to the issues, identity of the subject matter, and that the moving pictures present an accurate and faithful representation of the scenes filmed." *Pittman v. Miss. Power & Light Co.*, 368 So. 2d 238, 240 (Miss. 1979) (quoting *Barham v. Nowell*, 243 Miss. 441, 449, 138 So. 2d 493, 495 (1962)).

¶44.    We find that Foster failed to properly raise this issue on appeal. In her brief, Foster does not reference any authority in support of her contention that the tapes should have been admitted; indeed, she does not even mention their exclusion in the "Argument" section of her appellate brief. The only argument Foster makes as to this issue is in her reply brief, and there, her only citation to authority is for the proposition that videotapes are helpful in

14

determining the validity of a will. Thus, we are not required to address this issue. *See Shavers v. Shavers*, 982 So. 2d 397, 401 (Miss. 2008) (citing *Ellis v. Ellis*, 651 So. 2d 1068, 1072 (Miss. 1995)).

¶45.    Had this issue been properly raised, it would not change the result. The chancellor indicated that he was not excluding the tapes on their merits, but rather because a proper predicate had not been laid for their introduction. Foster failed to provide any evidence that the tapes she provided were what she claimed they were.[8] Since Foster did not properly authenticate the tapes or provide any evidence that they were properly submitted, the chancellor did not abuse his discretion in holding that no proper predicate had been laid for their introduction.

¶46.    Since we are remanding this case, however, this finding does not prejudice Foster. We are remanding this cause for a determination as to whether Laughter had testamentary capacity when he executed the May will and whether Laughter was unduly influenced by Williams at the time of the May will. On remand, therefore, the admissibility of the tapes will be subject to the relevance and authentication requirements set forth in the Mississippi Rules of Evidence.

> D.    *Whether the chancellor erred in limiting argument at the summary judgment hearing to fifteen minutes.*

---

[8] The only evidence in the record pertaining to the tapes' authenticity is the subpoena demanding the March tape from the attorney who recorded it. Only one Mississippi case has been found in which a party was permitted to authenticate evidence using a subpoena, and in that case, the subpoena was corroborated by the testimony of the police officer who served it. *Seigfried v. State*, 869 So. 2d 1040, 1046 (Miss. Ct. App. 2003).

¶47.    Foster also contends that at the hearing on summary judgment, the chancellor erred in limiting each side's argument to fifteen minutes. However, this issue was not properly preserved for appeal. It is well-established that a contemporaneous objection is required in order to preserve an issue for appeal. *See Barnett v. State*, 725 So. 2d 797, 801 (Miss. 2001) (citing *Crenshaw v. State*, 520 So. 2d 131, 134-5 (Miss. 1988)).

¶48.    Foster did not raise this issue until more than six months after the hearing on summary judgment. Foster stated to the chancellor many times at the hearing that she was worried about her time running out, but at no point during the proceedings did Foster object to the time limits set by the chancellor. Thus, Foster is barred from arguing this issue on appeal.

**II.    Whether the promissory note constituted an *inter vivos* gift to Foster.**

¶49.    The chancellor's order in this case did not expressly address whether the note was an *inter vivos* gift. Instead, the chancellor simply held that the note "is in fact an asset of [Laughter's estate]." This ruling necessarily rejected Foster's claim that the promissory note was an *inter vivos* gift, which is a question regarding application of the law. Thus, we apply a de novo standard of review. *In re Estate of Farmer ex rel. Farmer*, 964 So. 2d 498, 499 (Miss. 2007).

¶50.    A party attempting to prove that an *inter vivos* gift was made must show the following by clear and convincing evidence: (1) that the donor was competent to make a gift; (2) that the donation was a voluntary act and the donor had donative intent; (3) that the gift must be complete and not conditional; (4) that delivery was made; and (5) that the gift was irrevocable. *In re Estate of Ladner*, 909 So. 2d 1051, 1054 (Miss. 2004) (citing *In re Estate*

*of Holloway*, 515 So. 2d 1217, 1223 (Miss. 1987), superceded on other grounds by statute, Miss. Code Ann. § 81-5-63 (Rev. 2004) (governing payment to one owner of joint deposits)).

¶51.  Delivery and relinquishment of control are requisites of an *inter vivos* gift. "A delivery either actual, constructive, or symbolical is an element essential to the validity of a[n *inter vivos* gift]." *Estate of Ladner*, 909 So. 2d at 1055 (citing *Thomas v. Eubanks' Estate*, 358 So. 2d 709, 713 (Miss. 1978)). One of the essentials of a valid *inter vivos* gift is that the property must be delivered in such manner that the donor retains no control or dominion over it. *Id.*

¶52.  We conclude that the promissory note in this case constitutes a completed *inter vivos* gift by Laughter to Foster. A gift of notes payable to the donor is perfected by delivery thereof to the donee. *Pace v. Pace*, 65 So. 273, 274 (Miss. 1914) (citing *Ashbrook v. Ryon's Adm'r*, 2 Bush 228 (Ky. Ct. App. 1867)). *See also Maier v. Hill*, 72 So. 2d 209 (Miss. 1954) (holding that transfer of physical possession of nine, $1,000 promissory notes to donee created valid *inter vivos* gift).[9]

¶53.  Laughter's transfer of the note to Foster met all the requirements of a valid *inter vivos* gift. Laughter had the requisite donative intent to give the promissory note to Foster, at a time when his competence is uncontested. Laughter voluntarily delivered the note to Foster

---

[9] This is the rule for gifts of promissory notes, which are distinguished from gifts of bank drafts and accounts. For the funds secured by the draft or account to be transferred as an *inter vivos* gift, not only must the draft or the bank passbook be transferred but the actual funds must be passed as well. *Greer v. Hampton,* 240 So. 2d 253, 255-256 (Miss. 1970) (citing *Pace*, 65 So. at 274)). Also, this rule does not affect the requirements for delivery for value, *i.e.* "negotiation," of a promissory note that is made payable "to the order of" the payee. Negotiation of such a note to a recipient requires not only delivery to the recipient but proper indorsement by the payee as well. Miss. Code Ann. § 75-3-201 (Rev. 2002).

when he gave her actual physical possession of it, completing the unconditional gift. Finally, Foster accepted the note and kept it at her home, which made the gift irrevocable. To make a completed gift of the note, there was nothing more that Laughter or Foster could have done.[10]

¶54. At the moment of Laughter's delivery of the note to Foster, the gift was complete. At that moment, the right to receive payment on the note also vested in Foster. Since Laughter did not indorse and negotiate the note to Foster, which would have extinguished Laughter's right to payment under the note, Adams had a choice whether to remit payments to Laughter or to Foster. At Laughter's death, however, the right to payment was vested in Foster alone, pursuant to the terms of the note itself and the sales contract between Laughter and Adams.

---

[10] There is only one available argument that the gift in this case was conditional or that Laughter did not give up dominion over the payments. The argument relies on the fact that the note expressly provided that Foster would be paid under the note only in the event of Laughter's death or his inability to accept payment.

Authorities from other jurisdictions are split as to whether this defeats Foster's claim to the note. *See Parker v. Mott*, 107 S.E. 500, 502 (N.C. 1921) (explaining disagreement). Some jurisdictions hold that gifts of negotiable instruments, payment upon which to the donee is conditional upon death of donor, are not effective as *inter vivos* gifts. For example, in *Parker v. Mott*, it was held that a delivery which confers on the donee power to control the fund only after the death of the donor, when by the instrument itself it is presently payable, is testamentary in character, and not good as a gift. *Parker*, 107 S.E. at 502 (citing *Cook v. Lum*, 26 A. 803 (N.J. 1893)). Other jurisdictions reach the opposite conclusion. In *Dinslage v. Stratman*, 180 N.W. 81 (Neb. 1920), it was held that "[t]he mere fact that actual enjoyment of the gift by the donee is, by the declaration of the gift, postponed until the death of the donor, does not render the gift either conditional, or testamentary, or in any way invalid." *Id.* at 83; *accord Tucker v. Tucker*, 116 N.W. 119 (Iowa 1908).

Whether an attempted *inter vivos* gift of a promissory note is defeated if the note makes payment to the donee conditional upon the donor's death is apparently a question of first impression in Mississippi. Because we find that Laughter met all the requirements for a valid *inter vivos* gift, however, we need not address the question here.

18

¶55. The promissory note given to Foster constituted an *inter vivos* gift. Therefore, the chancellor erred in determining that the note was an asset of Laughter's estate.

## CONCLUSION

¶56. The evidence before the chancellor was sufficient to raise genuine issues of material fact as to Laughter's testamentary capacity at the time of the May will and as to whether Laughter and Williams had a confidential relationship such that Laughter was unduly influenced by Williams when executing the May will. Further, Laughter's gift of the promissory note to Foster had all the elements necessary to constitute a completed and successful *inter vivos* gift, and thus, the note is not an asset of Laughter's estate. The chancellor's decision to the contrary was in error.

¶57. The chancery court's order granting summary judgment in favor of Williams is reversed, the chancery court's finding that the promissory note is an asset of Laughter's estate is reversed, and this case is remanded for further proceedings consistent with this opinion.

¶58. **REVERSED AND REMANDED.**

**CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. LAMAR, J., NOT PARTICIPATING.**

19